# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-1503, 98-1531

_____

| | | |
|---|---|---|
| Dennis D. Brown, | * | |
| | * | |
| Defendant-Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| United States of America, | * | |
| | * | |
| Appellee. | * | Appeals from the United States |
| | * | District Court for the |
| David Lawrence Hay, | * | Southern District of Iowa |
| | * | |
| Defendant-Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| United States of America, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: November 19, 1998
Filed: February 25, 1999

_____

Before BOWMAN, Chief Judge, LOKEN, Circuit Judge, and HAND,[1] District Judge.

_____

HAND, District Judge:

Appellants pled guilty to conspiracy to distribute cocaine and methamphetamine in violation of 21 U.S.C. § 846.[2] In addition, appellant Hay pled guilty to being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Hay was sentenced to 86 months' imprisonment, while Brown received a sentence of 108 months. On appeal, appellants challenge the District Court's computation of the drug quantities attributable to them under the Sentencing Guidelines, and challenge certain guideline enhancements applied to them. Having given careful consideration to the appellants' claims, we affirm both sentences.

## I. STANDARD OF REVIEW

Our review of the district court's factual findings and its application of the Sentencing Guidelines is limited to determining whether its conclusions were clearly erroneous. *United States v. Snoddy*, 139 F.3d 1224, 1226 (8th Cir. 1998). We turn now to the issues raised by the appellants.

## II. DISCUSSION

_____

[1]The Honorable William Brevard Hand, United States District Judge for the Southern District of Alabama, sitting by designation.

[2]Count 2 of the superseding indictment, to which both appellants pled guilty, charged the appellants with conspiracy to distribute cocaine and methamphetamine from about November 1, 1995 until November 20, 1996.

A.      Dangerous Weapon Enhancements Pursuant to U.S.S.G. § 2D1.1(b)(1)

Both appellants received enhanced sentences because of possession of dangerous weapons, namely firearms, in connection with their respective offenses. We will affirm these enhancements.

The relevant guideline provision is U.S.S.G. § 2D1.1(b)(1), which provides, "If a dangerous weapon (including a firearm) was possessed, increase [the base offense level] by **2** levels."  The Sentencing Guidelines Manual explains that "[t]he adjustment should be applied if the weapon was present, unless it is *clearly improbable* that the weapon was connected with the offense.  For example, the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet." U.S.S.G. § 2D1.1, comment. (n. 3) (emphasis supplied).  In order to sustain an enhancement under 2D1.1(b)(1), "the government must first show that the weapon was present, and second, that it was not clearly improbable that the weapon had a nexus with the criminal activity." *United States v. Bost*, 968 F.3d 729, 731 (8th Cir. 1992).

(1)     Dennis Dean Brown

In Brown's case, the district court applied the firearm enhancement on the basis of firearms found and seized at the El Forastero clubhouse when search warrants were executed there on November 20, 1996.  Those firearms included a loaded Kurtz 9mm handgun; a loaded double-barrel 12-gauge shotgun; a loaded .357 Magnum handgun; a Ruger Mini-14 carbine, with loaded magazines nearby; an M-1 carbine, with ammunition nearby; a Mossberg 12-gauge pistol-grip shotgun, with ammunition nearby; and another 12-gauge shotgun.  In addition, in Brown's living quarters, there was found a single-shot 12-gauge shotgun and a box of 12-gauge shotgun shells.

3

Brown argues that the firearms were kept at the El Forastero clubhouse for club security and had nothing to do with his illegal drug activities. However, we have recognized that the use or intended use of firearms for one purpose, even if lawful, does not preclude the use of the firearm for the prohibited purpose of facilitating the drug trade, and therefore does not automatically remove the firearm from the purview of U.S.S.G. § 2D1.1(b)(1). *United States v. Rogers*, 151 F.3d 851, 858 (8th Cir 1998) ("The fact that a gun is treated as an item of commerce does not render it inert or deprive it of destructive capacity. Rather, as experience demonstrates, it can be converted instantaneously from currency to cannon.").

In fact, the Brown sentencing record suggests that Brown was willing to use the firearms at the clubhouse in defense of his drug trafficking from law enforcement. In an intercepted discussion between Brown and El Forastero leader Steve Humphreys, Brown and Humphreys discussed a possible problem with law enforcement and surveillance of the clubhouse. Brown commented that if a particular person came to the door of the clubhouse, he would go out the back door and come up behind the person "locked and loaded."

Based on the number, type, and the state of readiness of the weapons found in the El Forastero clubhouse, and the evidence of Brown's willingness to use the firearms to defend his drug trafficking, we can not agree with Brown that the district court "clearly erred" and that it was "clearly improbable" that the firearms were related to the drug trafficking activities undertaken by Brown in and around the clubhouse.

(2)　David Lawrence Hay

Hay's sentence was enhanced under 2D1.1(b)(1) due to a 26-piece firearm collection he kept in a safe in his residence. The collection admittedly consisted of some long guns, guns of a collector's nature, and some others not usually associated

4

with criminal activity. However, also among the collection were a loaded AMT .45 caliber pistol, a loaded Browning 9mm pistol, a loaded Colt .45 caliber "Gold Cup" pistol, and a loaded Savage Arms .410 shotgun. Hay contends that he should not have received a dangerous weapon enhancement because these firearms, kept in a gun safe on the main level of Hay's residence, were merely a collection, like his collection of antique knives and scale models, and were therefore clearly unrelated to his drug offenses. We affirm the firearm enhancement applied to Hay's sentence.

The testimony of Craig Collins at Hay's sentencing hearing established that Hay sold cocaine out of his house on a regular basis during the period of June or July of 1994 through November 1996. Collins testified that he purchased cocaine from Hay at his residence on 30 to 50 occasions during this time period. The cocaine sales would be carried out either in the basement, or in the kitchen on the same level of the house on which the safe was kept. Most of the time, Collins testified, Hay would place the money from Collins' cocaine purchases inside the safe with the firearms. Also, during the search of Hay's residence on November 20, 1996, agents searched Hay's gun safe. Inside the gun safe, officers found a wooden box containing $3,505 in cash, mostly in $20, $10, and $5 bills. Among that currency, authorities were able to identify by serial number four $20 bills that confidential informant Jerald Clausi had used in a controlled buy of four ounces of cocaine and a smaller quantity of methamphetamine on September 24. One of the loaded pistols in the safe was found directly adjacent to this box.[3]

---

[3]We note that Hay in his brief incorrectly states that he "kept *unloaded* firearms in a locked safe on the first floor," while the record establishes that several of the firearms were, in fact, loaded. He also states that "[n]o . . . drug paraphernalia were in the safe" while in fact the safe contained at least $80 in undisputed drug money.

We have previously noted that the close proximity of firearms and "drug money" can give rise to an inference that the firearms are present to protect the money and drugs, which is a nexus sufficient to support an enhancement under 2D1.1(b)(1). *United States v. Macklin*, 104 F.3d 1046, 1048 (8th Cir. 1997).

We believe that the government has satisfied its burden of proof under *Bost, supra,* and appellant Hay has not proven that it is "clearly improbable" that any of his firearms were related to his drug distribution activities. The district court did not clearly err in finding that Hay possessed at least one firearm in connection with his illegal activity.

B. Drug Quantity Issues: U.S.S.G. § 2D1.1

Both appellants argue that they should not be held accountable for the five ounces of cocaine and five ounces of methamphetamine involved in the discussions of November 19, 1996. Hay also argues that he should not be held accountable for 21.47 grams of actual methamphetamine found at co-conspirator Jeffrey Mitchell's house.[4]

During the late afternoon hours of November 19, 1996, Jerald Clausi made several phone calls to Brown at the clubhouse in an attempt to set up a third and final drug deal involving cocaine and methamphetamine. Clausi finally reached Brown, and the two discussed a sale of five ounces of each drug. Clausi had been instructed by law enforcement officers to delay the consummation of the deal until the next morning; however, Brown stated that he could do the deal that very night. Clausi informed Brown that he was out of Des Moines at the time, but that he could transact

---

[4]21.47 grams is equivalent to approximately 0.76 ounces.

the sale the next morning.  Brown suggested that Clausi call him at 10 or 10:30 the next day.

Shortly after this conversation, Brown called Hay, and after some small talk, stated, "I'm waiting for my kid to call me back," which agent Warford testified was code language meaning that a drug deal was imminent.  Hay replied, "Oh, waiting for your kid to call you back?  I see."  Later, Brown called Hay again, informing him that he was going to stop by Hay's residence shortly.  Hay said, "Okay."

Later, Jeffrey Mitchell called Steve Humphreys and stated, "Hey, Brown wants to do the deal again."  Co-conspirator Humphreys, apparently angered that Mitchell was discussing the matter over the telephone, said, "Too bad.  I'm not going to do it."

With regard to the 10-ounce transaction, appellants argue that (1) a deal was never made; (2) even if there was a deal, it was terminated by Humphreys; and (3) even if the deal was not terminated, the amounts should not apply to them because they were actually unable to supply the full amount of the drugs.

We think the record evidence leads to a fair inference that an actual agreement was in fact made for five ounces of cocaine and five ounces of methamphetamine, and that both Brown and Hay assented to the transaction.  Even if *Humphreys* did ultimately deep-six the deal, the district court properly attributed these drug amounts to Brown and Hay.

We find worthy of discussion only appellants' argument that they were unable to supply the full 10 ounces of controlled substance involved in the November 19 deal.  All parties direct our attention to U.S.S.G. § 2D1.1, Application Note 12, which states, in pertinent part:

> In an offense involving an agreement to sell a controlled substance, the agreed-upon quantity of the controlled substance shall be used to determine the offense level unless the sale is completed and the amount delivered more

7

accurately reflects the scale of the offense. . . . If, however, the defendant establishes that he or she did not intend to provide, or was not reasonably capable of providing, the agreed-upon quantity of the controlled substance, the court shall exclude from the offense level determination the amount of controlled substance that the defendant establishes that he or she did not intend to provide or was not reasonably capable of providing.

According to the foregoing text, as an initial matter, the full 10 ounces of cocaine and methamphetamine should apply, simply by virtue of an agreement to sell that quantity of drugs, even though the agreement was never consummated. The 10 ounces involved in the November 19 agreement should not count only if the *appellants* sustain their burden of proving that the conspiracy was not reasonably capable of providing the full 10 ounces of drugs. *See, e.g., United States v. Christian*, 942 F.2d 363, 368 (6th Cir. 1991), *United States v. Barnes*, 993 F.2d 680 (9th Cir. 1993).

Appellants argue that the conspiracy was not reasonably capable of providing these amounts because (1) their methamphetamine source, Steve Humphreys, backed out of the deal, and (2) even when government agents searched all of the parties involved in the conspiracy, they failed to aggregate enough drugs to complete the deal.

The Government argues, and we agree, that the appellants have not shown that they were incapable of providing the full 10 ounces, for two reasons. First, while Brown was still on the phone with Clausi after making the deal, he stated that he wanted to actually "do" the deal that night. This expression of intent to complete the transaction belies defendants' present contention that they were unable to do so. Second, the fact that the November 20 searches failed to produce the total 10 ounces does not prove that Brown and Hay could not have produced the drugs. Clausi

testified that Brown told him Brown had methamphetamine available in quarter-pound (four-ounce) increments and that Brown could supply him with as much as he needed. This statement establishes that the defendants' argument of inability to supply the methamphetamine is without merit.

For the foregoing reasons, we conclude that the district court did not clearly err in holding both appellants accountable for the 5 ounces of cocaine and 5 ounces of methamphetamine involved in the November 19 deal.

We are mindful of the potential for abuse claimed by the appellants, to which we alluded in the case of *United States v. Foley*, 906 F.2d 1261, 1265 (8th Cir. 1990).[5] Such potential for executive abuse, particularly after the advent of guideline sentencing, should never escape the independent scrutiny of the judiciary. However, we are not persuaded that the appellants have been the victims of such abuse in this case. The 10 ounces of drugs involved in the November 19 deal were not so far beyond the scope of the established pattern of conduct envisioned by the conspiracy, that exclusion of the agreed-upon drug amounts is justified.[6]

Next, Hay attempts to acquit himself of the five ounces of methamphetamine

---

[5]The guidelines may permit a downward departure in an analogous situation: "If, in a reverse sting . . . , the court finds that the government agent set a price for the controlled substance that was substantially below the market value of the controlled substance, thereby leading to the defendant's purchase of a significantly greater quantity of the controlled substance than his available resources would have allowed him to purchase except for the artificially low price set by the government agent, a downward departure may be warranted." U.S.S.G. §2D1.1, comment. (n. 15) (1998).

[6]Even if we were to accept this argument, total exclusion of the 10 ounces might not be warranted. Instead, the more appropriate remedy may be to vacate the judgement and remand for resentencing, with instructions to remit the agreed-upon amount to an amount more closely approximating the established course of conduct of the conspiracy taken as a whole.

and the 21.47 grams of actual methamphetamine found at Jeffrey Mitchell's house on November 20. He claims that he was merely the "cola guy"--the cocaine supplier--for the conspiracy, and therefore should not be held accountable for the methamphetamine. Hay's guilty plea, and facts to which he has stipulated, foreclose this argument. Hay pled guilty to count 2 of the superceding indictment, which charged conspiracy to distribute cocaine *and methamphetamine*. In addition, Hay stipulated that *he knew* that the conspiracy was distributing cocaine and methamphetamine, and that the conspiracy *actually did* distribute cocaine and d-methamphetamine. Finally, traces of cocaine and methamphetamine were detected on drug paraphernalia found at Hay's residence. We reject as factually unsupportable Hay's argument that he was merely the "cola guy" for the conspiracy.

### C. Obstruction-of-Justice Enhancement: U.S.S.G. § 3C1.1

Finally, appellant Brown assigns as error the district court's addition of two points to his offense level for obstruction of justice.

The applicable guideline is U.S.S.G. § 3C1.1, which provides that:

> If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by **2** levels.

In support of this final assignment of error, Brown propounds two arguments. First, he argues, his statements to the confidential informant do not rise to the level of obstruction of justice. Second, he says that he can not receive an enhancement for obstruction of justice if he did not know there was an ongoing investigation. We reject both arguments.

10

As to Brown's first argument, we believe the nature and frequency of certain threats made by Brown justify the obstruction-of-justice enhancement. The evidence before the district court at sentencing established that Brown on one occasion opened Clausi's shirt as if he was looking for a wire and told Clausi that if anything were to happen to him there would be "hell to pay" from his "brothers." During another transaction, Brown warned Clausi that if anything happened to him, "there would be some people getting even." On a third occasion, inside the El Forastero clubhouse, Brown passed or showed to Clausi a handwritten note, again to the effect that "there would be hell to pay" if Clausi turned out to be working for the government.

Obstruction of justice applies to "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly." U.S.S.G. § 3C1.1, App. Note 3(a); *also see United States v. McIntosh*, 23 F.3d 1454, 1459 (8th Cir. 1994). The nature of Brown's statements would certainly have the effect of chilling a reasonable person's cooperation with law enforcement authorities. Therefore, we hold that the evidence adequately supports the imposition of the enhancement under U.S.S.G. § 3C1.1.

Second, Brown argues that he could not have obstructed justice, and therefore should not have received the enhancement, if he did not have actual knowledge of an ongoing criminal investigation. It is true that the guideline text incorporates a requirement of "willful" conduct. Indeed, we have recognized that "the term 'willfully' should be reserved for the more serious case, where misconduct occurs with knowledge of an investigation, *or at least with a correct belief that an investigation is probably underway*." *United States v. Oppedahl*, 998 F.2d 584, 586 (8th Cir. 1993) (emphasis supplied).

The district court made a finding on the record that Brown held the belief that an investigation was probably underway. Of course, this belief, if subjectively held,

would have been correct.  We hold that the district court's finding on this issue is supported by ample evidence and is not clearly erroneous.  It may be reasonably inferred from Brown's pattern of conduct that he believed that an investigation was "probably underway" and that Jerald Clausi was involved.  Accordingly, the district court did not clearly err in applying the obstruction of justice enhancement to Brown.

## III.  CONCLUSION

For the foregoing reasons, we can not agree that the district court committed clear error in any of the matters alleged by the appellants.  The judgments of the district court are **AFFIRMED.**

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.