# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-2007
_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Plaintiff–Appellee, | * |
| | * |
| v. | * |
| | * |
| Thomas James Martin, | * |
| | * |
| Defendant–Appellant. | * |

_____

Nos. 03-2255/2459

_____

Appeals from the United States District Court for the District of Minnesota.

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee/Cross-Appellant, | * |
| | * |
| v. | * |
| | * |
| Joseph Paul Biernat, | * |
| | * |
| Appellant/Cross-Appellee. | * |

_____

Submitted: February 9, 2004
Filed: May 28, 2004

_____

Before MELLOY, FAGG and COLLOTON, Circuit Judges.

_____

MELLOY, Circuit Judge.

Minneapolis City Councilman Joseph Biernat ("Biernat") appeals his convictions of mail fraud, causing the theft of union funds, and lying to the FBI. Thomas Martin ("Martin"), business manager for the Plumber's Union Local 15 (the "Union"), pled guilty to mail fraud and theft from a union organization. He appeals the district court's[1] two-level sentence enhancement for obstruction of justice. The government cross-appeals Biernat's two-level "minor role" reduction. We affirm.

## I. FACTS

This is a public corruption case in which Joseph Biernat and Thomas Martin were accused of trading $2,700 of free plumbing services in a home owned by Biernat for Biernat's vote to put Martin on the Minneapolis Plumber's Examining Board (the "Plumber's Board").

As part of his duties as business manager of the Union, Martin managed the Union's market recovery fund. This fund was designed to subsidize member contractors so that they could bid competitively with non-union contractors. The government accused Martin of misusing the fund's resources to pay for plumbing work at six separate residences. One of these residences was owned by Joseph Biernat and occupied by his mother, Sophie Biernat. The evidence shows Martin asked Norblom Plumbing to evaluate the work needed in Mrs. Biernat's home. On the same date, Joseph Biernat voted affirmatively to forward Martin's name to the city council for appointment to the Plumber's Board. Approximately two weeks later,

_____

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

Norblom Plumbing completed repairs on Sophie Biernat's home. Martin then authorized payment in full, in the amount of $2,700, to be drawn from the market recovery fund and paid to Norblom Plumbing.

### A. Councilman Biernat

Biernat claimed at trial that he knew nothing of the payment arrangements for the plumbing and that he took no efforts to appoint Martin. However, Biernat signed two written statements for the FBI in which he admitted his illegal actions.

FBI agents first interviewed Biernat on August 1, 2001, on a related matter. An agent asked if Biernat or anyone in his family had received any improvements to real property from anyone other than family members. Biernat responded in the negative.

### 1. The March 7 Interview

FBI agents again interviewed Biernat on March 7 and 8, 2002. On March 7, agents in a car approached Biernat as he was on foot. The agents rolled down the window of the car, identified themselves, and said that they had some information to share with Biernat. The agents informed Biernat that meeting with them would be fully voluntary. The agents asked Biernat if he would like to return to his car. Biernat did so, then approached the agents on foot. Agent Sean Boylan ("Boylan") reminded Biernat that the meeting was voluntary, then invited Biernat to sit in the unmarked Oldsmobile Boylan was driving. Biernat accepted and sat in the front passenger seat next to Boylan, who was in the driver's seat. Agent Todd Thompson ("Thompson") subsequently joined the men and sat behind the driver's seat.

Biernat told Boylan that he was carrying laboratory samples to a doctor's office located in the Hennepin County Medical Center and suggested that Boylan

accompany him while he delivered the samples. Boylan agreed, and the two men walked towards the doctor's office. Thompson stayed with the car. Another agent, Andrew Mento ("Mento"), arrived and joined the men on the walk. During their trip to the office, Biernat informed Boylan that he had contracted a stomach virus on a recent trip to Guatemala, and that the samples he was delivering were related to this condition. Biernat did not mention that he was taking Ciprofloxacin ("Cipro") for the virus. Side effects of Cipro may include anxiety, nervousness, agitation, insomnia, and nightmares.

When they arrived at the Medical Center, Biernat entered an office suite, while the agents waited outside. Biernat exited the first office suite and indicated he had to go to a different office located down the hall. The agents remained by the first office suite. When Biernat returned, Boylan asked him if there was a place nearby they could sit and talk. With Biernat's permission, the three men returned to the Oldsmobile. Biernat sat in the passenger's seat and Mento sat behind Boylan, who was in the driver's seat. The men tried to find a fast food restaurant, but failed to find one. Boylan suggested going to the FBI office, which was nearby. Biernat did not respond. Boylan interpreted Biernat's silence as a negative response and continued driving.

Biernat then suggested the cafeteria at the Hennepin County Medical Center. The men went to the cafeteria, and Boylan suggested sitting in a relatively uncrowded area in the corner of the cafeteria; Biernat agreed. Biernat walked toward one of the tables and sat down, facing a wall, with his back to the cafeteria's main seating area. With Biernat's permission, Boylan sat directly across from him. According to Biernat, he sat with a wall on his right, Mento to his left, and a large pillar behind him.

Boylan again reminded Biernat that the meeting was voluntary. Boylan then presented Biernat with information about the FBI's investigative tools and procedures

and requirements for cooperation.  Boylan asked Biernat to try to keep from asking questions until the end of the presentation.  The presentation lasted between twenty and thirty minutes.  During the presentation, Boylan showed Biernat information about a previous public corruption case targeting Minneapolis City Councilman Brian Herron ("Herron").  Boylan displayed newspaper articles about the investigation, a consensual video recording of Herron accepting a bribe, and Herron's signed statement.  The agents also showed a folder with Biernat's face and name on it and suggested they had information about Biernat.  The agents then left the table for several minutes.

Upon their return, the agents again advised Biernat that his presence was voluntary.  They also asked him if he wanted something to eat or drink or if he needed a bathroom break.  Defendant answered, "No, let's keep going."  The agents then began to question Biernat as to whether he had done anything illegal in his position as a councilman.  Biernat told the agents that he had received a free kitchen upgrade in 1993 and that he had not declared the value of the improvements on his taxes.  He also told the agents that his mother's home had a plumbing problem and that he had mentioned the problem to Martin in the fall of 1998.  Biernat said that Martin had arranged to have repairs done by union plumbers  sometime between late 1998 and mid-1999.  Biernat admitted that he did not pay for the repairs and that he knew it was illegal not to do so.

After Biernat had given them this information, the agents reduced Biernat's statements into a written statement.  They asked him to sign the statement if it was true.  Biernat read and edited the statement.  The first paragraph of the statement reads: "By reviewing the statement, initialing each page and signing the statement, I acknowledge that no one has threatened, coerced or promised me anything." Biernat made changes to the statement. For example, Biernat inserted "I asked Martin about the bill and he said he'd get it which means it would be forthcoming."  Biernat

also changed the description of his failure to declare the value of the plumbing work from "illegal" to "unethical."

Boylan testified that Biernat appeared ill on March 7. However, Boylan testified that Biernat seemed alert, responded appropriately to questions, and had no apparent difficulty concentrating. Biernat made two follow-up calls to Boylan, whom he refered to as "Sean." During the first call, Biernat left his wife's cell phone number on Boylan's voicemail, explained his plans to take his son to the barber, and said he would call back with his pager number. Later that afternoon, Biernat called back and left the pager number.

### 2.    The March 8 Interview

On the morning of March 8, Biernat telephoned his brother, Leonard Biernat, to discuss the situation. Leonard is a licensed attorney, but he has not actively practiced law since 1985. He is a member of the Minnesota House of Representatives and teaches ethics and family law at Hamline Law School. Leonard went to Biernat's home at 10:30 a.m.

Boylan telephoned Biernat around 10:50 a.m. and asked him if he would meet with the agents for a second time. Boylan stated that this meeting would be voluntary. Biernat agreed and decided the agents should come to his home. Boylan and Agent Timothy Bisswurm ("Bisswurm") agreed to meet him there. During the telephone conversation, Biernat stated that his brother was with him, and that Leonard was a lawyer and a friend, and had asked to be present. According to Boylan, he said he would arrive between 12:30 and 12:45 p.m. According to Biernat, Boylan said he would arrive in about fifteen minutes. Leonard left the house around 1:00 p.m., believing the agents were not coming. Before he left, he advised his brother not to sign anything during his meeting with the agents.

Minutes later, Boylan and Bisswurm arrived at the Biernat household. Biernat greeted the agents at the door and led them to the living room. Biernat sat on the couch, and Boylan sat next to Biernat. Bisswurm sat across from the two men. Mrs. Biernat soon joined them in the livingroom, and she sat next to Bisswurm. Boylan reminded the Biernats that the meeting was voluntary and that they did not have to talk to the agents. According to Boylan, Biernat replied that he had heard that a lot yesterday. Later, during the meeting, he said he was sick of hearing it. Biernat said that he wanted his brother present. The agents did not inquire as to whether Biernat was represented by counsel, and Biernat never claimed that Leonard was acting as his attorney.

Mrs. Biernat asked the agents if they needed an attorney present. Boylan responded that it would be inappropriate for the agents to give any advice in that regard and that the Biernats had to make their own decision. The meeting then proceeded. Mrs. Biernat left the meeting several times to answer the telephone. She also offered the agents water, which she retrieved from the kitchen.

Biernat and the agents revisited the subject of the free plumbing Biernat had received, and the agents again reduced Biernat's statement to a written statement. At 3:25 p.m., Biernat began to review the written statement. Biernat showed the statement to his wife. Biernat edited the statement. Again, he added language stating that he had asked Martin about a bill, and Martin had said it would be forthcoming. Biernat changed "I knew I (owed) him and if I didn't vote for Martin he could expose my illegal activity of accepting the free work" to "I knew I was obligated to him . . .", among other things. After Biernat reviewed the statement for thirty minutes, Boylan placed a telephone call and then advised Biernat that the agents would have to leave in about ten minutes. Biernat stated that if he hired an attorney, an attorney would tell him not to sign the statement. Boylan again said the meeting was voluntary, and that he could not advise him on the issue of an attorney.

Biernat claims that the agents threatened to "make his life a living hell" if he did not sign the statement. The agents deny having made this threat. Biernat also claims that agents threatened to involve Biernat's seven-year-old son, his son's teacher, his elderly mother, and his neighbors in the investigation. Agent Boylan admits he said that an investigation might involve talking to Biernat's son's teacher and Biernat's neighbors, but denied making any threats.

Biernat signed the statement. As with the statement from the previous day, a paragraph included in the statement said that signing it was an acknowledgment that the statement was voluntary, and that Biernat had not been threatened, coerced, or promised anything in return for signing the statement.

The district court found that agents made no show of force or intimidation and did not make any threats or promises in order to obtain a statement. In particular, the district court found that the agents did not make threats with respect to Biernat's son and school teacher or the neighbors. Bisswurm carried a firearm during the meeting, but the agents made no reference to the weapon, and no firearms were ever brandished. The district court found that Biernat was coherent throughout the interview and that he was not impaired by illness or the effects of medication. The meeting was about three and one-half hours long.

In sum, the March 7 and 8 statements admitted the following: Biernat admitted that he asked Martin about some plumbing problems at his mother's home. Biernat stated that Martin caused Union plumbers to do repairs at the home, and that Martin knew these repairs were worth at least $1,000. Biernat admitted that he did not pay for the work and that he knew it was illegal not to pay for the plumbing work he had received. However, he stated that he asked Martin about the bill and that Martin said it would be forthcoming. Biernat also admitted that he felt obligated to vote for Martin's appointment to the Plumber's Board, because Martin could expose the fact

that Biernat had received Union plumbing work and never paid for it. Biernat also noted that Martin's appointment was a consent item on the agenda.

### 3. The District Court Proceedings

The district court found that Biernat's written statements were voluntary, and that <u>Miranda</u> warnings were not required because the interviews were noncustodial. The district court also excluded certain evidence relating to the circumstances of the interviews. The district court held that, because it had found Biernat's statements voluntary, "interrogation tactics or evidence relating to the voluntariness determination are inappropriate and will not be the basis for a cross-examination of [the interviewing agent]."

After a jury trial, Biernat was convicted of mail fraud, in violation of 18 U.S.C. §§1341 and 1346, causing the theft of union fund, in violation of 29 U.S.C. §501(c)/18 U.S.C. §2(a) & (b), and lying to the FBI, in violation of 18 U.S.C. §1001. Biernat was acquitted of violating the Hobbs Act. He was sentenced to 21 months imprisonment.

### B. Thomas Martin

Martin's appeal focuses on the two-level adjustment for obstruction of justice he received at sentencing. The government makes two main arguments in support of the obstruction of justice enhancement in Martin's case. First, the government argues that Martin, in a taped conversation, stated his intention to destroy documents, and that in fact these documents were never produced nor otherwise discovered. Second, the government contends that Martin tried to cover up free plumbing work performed at the home of his sister, Elizabeth Hinton, and her husband, Daniel Hinton, by attempting to create a paper trail evidencing payment for the work, and then failing to produce a relevant document in response to a government subpoena.

### 1.  The February 18, 2002 Conversation

On February 18, 2002, Martin met with Jeff Norblom, who wore a wire in cooperation with the FBI.  A transcript of the recording was admitted into evidence.  According to the transcript, Norblom told Martin that Department of Labor Investigator Mary Agnew had subpoenaed documents regarding the use of the Union's fund to provide free plumbing work.  Norblom showed the requested documents to Martin.  Martin repeatedly told Norblom to cooperate with the requests and tell the truth.  During the conversation, Martin asked if they were being recorded.  Norblom assured him they were not, and the conversation continued.

Towards the end of the conversation, the following exchange occurred:

| | |
|---|---|
| Martin: | Alright.  Now what are these? |
| Norblom: | This is my drawing on the house. |
| Martin: | Okay. |
| Norblom: | That's the order for the fixtures. |
| Martin: | Okay. Okay. Okay. Now. Tell her the truth. Tell her everything I told you to do. |
| Norblom: | So, okay, so basically tell her that, that so lie to her just say that doesn't– |
| Martin: | No.  Don't lie to her. |
| Norblom: | –exist. [sic] Okay, that doesn't exist. |
| Martin: | Don't lie to her. |
| Norblom: | What, what, what's gonna happen to that? |
| Martin: | I am probably going to tear it up.  I know I am. |
| Norblom: | Alright. |
| Martin: | Are there any other copies of this? |
| Norblom: | No, that's it. |

The government argues that the documents at issue in the above exchange were not produced in response to the Department of Labor subpoena, were not found during a search of the Union's office, and were not found since.

## 2.    The Hinton Check

The government also contends that Martin tried to cover up the fact that his sister and her husband never paid for the plumbing work done on their home.  On approximately February 18, 2002, Martin told Daniel Hinton that the Union was looking at records, and requested that Hinton pay the Union for the plumbing work performed in 1999.  Martin told Daniel Hinton to write two checks—one including interest and the other not including interest—and to backdate the checks by a day or two.  Martin told Daniel Hinton that if anyone asked about the checks, Hinton was to tell them that he "was just finally getting around to paying for the plumbing work done in 1999."  Daniel Hinton did not have enough money in his checking account to cover the payment, and Martin gave him $3,500 in cash to cover the checks.  Daniel Hinton complied and wrote two checks, both of which he backdated.

On February 28, 2002, the Department of Labor subpoenaed documents from the Union,  including "All records for all payments issued by the Union to Norblom Plumbing for advertising, work completed by Norblom Plumbing for Dan and Elizabeth Hinton, . . . Sophie Biernat, . . . and the $3,000 payment issued by Local 15 to Norblom Plumbing in December 1999."  On March 6, 2002, Martin produced certain documents requested in the subpoena including a note signed by Daniel Hinton promising to pay $6,000 to the Union.  The next day, law enforcement agents executed a search warrant at the Union's offices and seized a copy of a $6,540 check payable to the Union, dated February 17, 2002, and signed by Daniel Hinton.

## 3.    The Plea

Martin pled guilty to mail fraud and theft from a union organization.  At sentencing, the district court applied a two-level enhancement for obstruction of justice, pursuant to USSG section 3C1.1.  The district court stated that the enhancement was based on three separate incidents.  The district court discussed the

-11-

taped conversation, and rejected Martin's argument that he was entrapped. The district court then stated:

> But putting aside that incident which I think is subject to a couple varying interpretations, I'm still left with solid evidence with regard to the Hinton transaction of cash distribution, a backdating of checks, and apparently issued note stuck later in the file after the subpoena had been issued, to convince me that there was a scramble that was taking place to cover up and obstruct justice by tinkering with the records and the documents, and for those reasons, I think under the circumstances the Government prevails upon its request for an obstruction of justice enhancement.

In his plea agreement, Martin reserved the right to argue that his two-level increase for obstruction of justice was unwarranted. Applying the obstruction of justice and other adjustments, the district court arrived at a sentencing range of twenty-four to thirty months, and sentenced Martin to twenty-four months. Without the obstruction of justice enhancement, the sentencing range would have been eighteen to twenty-four months.

## II. DISCUSSION

### A. Joseph Biernat

#### 1. March 7 and 8 Statements

Biernat claims that the district court erred in failing to suppress the statements made on March 7 and 8, 2002. He contends that the statements (1) were involuntary and made as a result of his weakened capacity to resist police pressure to confess and (2) were made in violation of his Miranda rights.

### a.  Voluntariness

#### i.  Standard of Review

"We review the district court's findings of fact for clear error and its legal conclusion as to whether a confession was voluntary de novo." United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004) (en banc).

#### ii.  Analysis

"To decide the voluntariness of a confession, we examine the totality of the circumstances to determine whether pressures exerted by the authorities overwhelmed the defendant's will." United States v. Rodriguez-Hernandez, 353 F.3d 632, 636 (8th Cir. 2003) (internal quotations and citation omitted). "Obviously, interrogation of a suspect will involve some pressure because its purpose is to elicit a confession." United States v. Astello, 241 F.3d 965, 967 (8th Cir. 2001). Using time pressure to elicit cooperation does not make a confession involuntary. See id. Further, "'a raised voice, deception, or a sympathetic attitude on the part of the interrogator will not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne.'" Id. (quoting Jenner v. Smith, 982 F.2d 329, 334 (8th Cir. 1993)). "Rather, the coercive conduct must be 'such that the defendant's will was overborne and his capacity for self-determination critically impaired.'" United States v. Santos-Garcia, 313 F.3d 1073, 1079 (8th Cir. 2002) (quoting Astello, 241 F.3d at 967).

Considering the totality of the circumstances, we find that Biernat's confessions were voluntary. The agents' actions, while perhaps not at all times straightforward, were not so coercive as to overcome Biernat's will or critically impair his capacity for self-determination. Biernat argues that he had a weakened capacity to resist the pressure to confess because of his stomach ailment and

medication. However, the district court found that Biernat was not suffering from any significant physical or mental impairment as a result of illness or medications during his interviews. This finding is not clearly erroneous, and is upheld. We are therefore unpersuaded by Biernat's weakened capacity arguments. Biernat also argues that the exclusion of his brother, Leonard, from the meeting on March 8 weighs against the voluntariness of his statement of that date. However, the Biernats never requested the assistance of counsel, and never informed agents that they were represented by Leonard Biernat. The fact that Leonard was not present does not tip the scales and render Biernat's statements involuntary. We also note that Biernat is a sophisticated individual who holds a college degree, was involved in city government, and was not especially susceptible to the interrogator's pressures because he lacked maturity or education. See Withrow v. Williams, 507 U.S. 680, 693-94 (1993).

### b. Miranda

#### i. Standard of Review

We review a district court's custody determinations de novo. LeBrun, 363 F.3d at 719. "'[I]n reviewing "in custody" determinations, we uphold findings of historical fact unless clearly erroneous, but we apply the controlling legal standard to the historical facts utilizing an independent review.'" Id. (quoting United States v. Axsom, 289 F.3d 496, 500 (8th Cir. 2002)).

#### ii. Analysis

The United States Supreme Court ruled in Miranda that a person "taken into custody or otherwise deprived of his freedom of action in any significant way" must be warned "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed" before law enforcement officers begin questioning.

-14-

Miranda v. Arizona, 384 U.S. 436, 444 (1966). The parties agree that Biernat did not receive Miranda warnings before making his March 7 and 8 statements. The government claims that no warnings were necessary because Biernat was not in custody. Biernat contends he was in custody and a warning was required, and his statements should be suppressed.

We therefore must determine whether Biernat was in custody during his interviews with the FBI on March 7 and 8, 2002. "'Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.'" LeBrun, 363 F.3d at 720 (quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995)). "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury v. California, 511 U.S. 318, 323 (1994).

To assess whether an interrogation was custodial, our court commonly uses six non-exhaustive indicia of custody. The presence of the first three indicia weighs against the existence of custody, while the presence of the latter three indicia supports the existence of custody. Axsom, 289 F.3d at 500-01. These indicia are:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990).

We uphold the district court's findings of fact regarding the circumstances of Biernat's two interviews with FBI agents as not clearly erroneous. See Axsom, 289 F.3d at 500. Considering a totality of the circumstances, we find Biernat's interview on March 7, 2002 was noncustodial. First, agents informed Biernat at least four times that his participation in the interview was voluntary. Biernat knew that he was not under arrest and that he was free to leave. Second, Biernat was not physically restrained by the agents. His freedom was unrestricted beyond the ordinary confines of being seated at a table in a public cafeteria. Third, Biernat voluntarily acquiesced to the FBI agents' requests to speak with him and participated in determining where the meeting was to take place. Fourth, the agents did not use strong arm tactics during the interview. While agents did discuss FBI surveillance techniques and imply they had information about Biernat, this type of coercion does not render the interview custodial. See LeBrun, 363 F.3d at 721 ("[S]ome degree of coercion is part and parcel of the interrogation process and . . . the coercive aspects of a police interview are largely irrelevant to the custody determination except where a reasonable person would perceive the coercion as restricting his or her freedom to depart.") Fifth, the atmosphere of the interview was not police-dominated. Two agents interviewed Biernat in a public place. Sixth, Biernat was not placed under arrest at the conclusion of questioning.

We also find that the interview on March 8, 2002 was noncustodial. First, Biernat was informed multiple times that the interview was voluntary. Second, Biernat and his wife were free to move around their house during the interview, and did so. Third, Biernat voluntarily acquiesced to the interview and participated in determining that the meeting would take place in his home. Fourth, no strong arm tactics were used. No weapons were brandished and no threats were made. The agents ultimately put a ten-minute deadline on signing the statement; however, this deadline fails to render the interview custodial. Fifth, the interview occurred in Biernat's home, with his wife present, and in the presence of only two officers. Sixth, Biernat was not placed under arrest at the termination of questioning.

The March 8 interview bears a resemblance to the interview conducted in Axsom. In that case, agents executed a search warrant at Axsom's home at 6:45 a.m., seeking evidence of child pornography. Axsom answered the door wearing only a towel, and nine federal agents entered his home. Several weapons were in the home, and the agents secured these weapons. Agents then escorted Axsom to his bedroom to dress. Agents interviewed Axsom in his living room without informing him that the questioning was voluntary and without giving him a Miranda warning. During the interview, Axsom was not allowed to get up to get himself a glass of water, and an agent escorted him to the bathroom. Axsom was issued a citation for marijuana possession at the end of the interview, but was not arrested. This Court found that under the circumstances of Axsom's interview, "a reasonable person would have felt he was at liberty to terminate the interrogation and walk away or turn his back on the agents." Axsom, 289 F.3d at 503. This is despite the fact that nine officers came to his home early in the morning, did not inform him that the interview was voluntary and he was free to leave, and restricted his freedom of movement throughout the encounter. Given this precedent, Biernat's interview, which included none of the aggravating factors present in Axsom, was clearly noncustodial.

## 2. Exclusion of Evidence

### a. Standard of Review

We review the lower court's ruling to admit or exclude evidence for an abuse of discretion. See United States v. Carroll, 207 F.3d 465, 470 (8th Cir. 2000).

### b. Analysis

"[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Crane v. Kentucky, 476 U.S. 683, 690 (1986) (quoting California v. Trombetta, 467 U.S. 479, 485 (1984)). This right includes the right to present certain evidence concerning a confession. However, "[o]nce the court

-17-

makes a preliminary determination that the confession is voluntary, then the only requirement is that the defendant be allowed to place the statements in context." United States v. House, 939 F.2d 659, 663 (8th Cir. 1991).

In Crane, the defendant was on trial for murder and moved to suppress his confession. 476 U.S. at 684. The trial judge held a suppression hearing and found that the confession was voluntary and should not be suppressed. Id. At trial, the defendant "sought to introduce testimony about the physical and psychological environment in which the confession was obtained," to suggest that the confession was not credible. Id. The trial court excluded the evidence, finding that it pertained solely to the issue of voluntariness. Id.

The Supreme Court reversed, finding that "evidence surrounding the making of a confession bears on its credibility as well as its voluntariness," id. at 688 (internal quotations omitted), and "the requirement that the court make a pretrial *voluntariness* determination does not undercut the defendant's traditional prerogative to challenge the confession's *reliability* during the course of the trial." Id. Thus, even if a trial court has already ruled on the constitutional question of voluntariness, a defendant is still free to present to the jury "circumstances that attend the taking of his confession, including facts bearing upon its weight and voluntariness." Id. (internal citation and quotation marks omitted).

In the present case, as in Crane, Biernat moved to suppress his confession. The trial court denied Biernat's motion, finding his confession voluntary. At trial, the district court ruled that it would allow evidence relating to "the circumstances, context, the milieu surrounding the taking of the statements," but not allow "questions relating to coercion or whether or not the statements made were involuntarily made." The district court further stated that "interrogation tactics or evidence relating to the voluntariness determination are inappropriate and will not be the basis for a cross-examination of the agent." However, the district court then proceeded to allow the defense to extensively cross-examine the agent who had

-18-

conducted the interrogation. The cross-examination filled 125 pages of the transcript, while the direct examination of the same agent filled only 89 pages.

Thus, while the district court's ruling allowed evidence regarding "the circumstances, context, the milieu surrounding the taking of the statements," the ruling disallowed any evidence relating to coercion or voluntariness. This judgment is difficult to square with Crane, which instructs that it is an incorrect assumption "that evidence bearing on the voluntariness of a confession and evidence bearing on its credibility fall in conceptually distinct and mutually exclusive categories." Id. at 687. Instead, "the circumstances surrounding the taking of a confession can be highly relevant to two separate inquiries, one legal and one factual." Id. at 688.

However, we need not square the present case with Crane because any error that may have occurred was harmless. See Id. at 691 (harmless error applies to whether exclusion of evidence was a violation of the right to present a full defense). The defense engaged in a lengthy cross-examination of the agent, giving the jury sufficient information about the context of the interrogations. In addition, the evidence against Biernat was great. Though the defense argues that Biernat was in ill-health and put in compromising positions when interrogated, the evidence is not so strong that it leads one to believe that Biernat falsely confessed. He was not forced to speak with the agents, he was not physically threatened, and he had some measure of control over the interview process. When presented with written statements to sign, Biernat was alert enough to make several revisions, striking out parts the agent had written and inserting his own language. Without the unlikely scenario of a wholesale rejection of Biernat's statements by the jury, there was more than sufficient evidence to convict Biernat on the counts relating to the free plumbing services he received. Therefore, any erroneous statement of law made by the district court was harmless.

### 3. The False Statement Conviction

#### a. Standard of Review

We review de novo the sufficiency of the evidence to sustain a conviction, viewing the evidence in the light most favorable to the verdict. United States v. Fitz, 317 F.3d 878, 881 (8th Cir. 2003).

#### b. Analysis

Biernat was convicted of making a false statement to an FBI agent in violation of 18 U.S.C. §1001. The basis for this conviction was an answer he gave in the interview conducted on August 1, 2001, as part of an investigation of another official, Brian Herron. During this interview, an agent interrogated Biernat with the guidance of a set of model questions. The last of these model questions reads: "Since entering public employment, have you or any of your family members asked for or received any improvements to any real property owned or occupied by you or your family members (including children and parents)?" At trial, the agent testified that he followed the written questions "just about to the letter" during the interview and that he asked Biernat "if the councilman or anyone in his family had received any improvements to real property from anyone other than his family members." He also testified that properties owned or occupied by the councilman were included in this question. He testified that Biernat replied in the negative by saying "no."

On appeal, Biernat attempts to show that a one-word answer to a complicated question is insufficient to sustain a conviction for making a false statement. However, the authority he cites does not support this position. Biernat cites to United States v. Vesaas, which holds that a conviction cannot stand when it is based on the response to "an ambiguous question where the response may be literally and factually correct." 586 F.2d 101, 104 (8th Cir. 1978). In that case, the defendant had been asked whether he held stocks in joint tenancy with his deceased mother. He

-20-

responded that he did not. In fact, he owned the stocks, and had owned them in joint tenancy with his mother before her death. Id. However, because it is legally impossible to own anything in joint tenancy with a dead person, his response was literally true. Other cases Biernat cites have similar factual situations: in each, the answer could be construed as false, though it was literally true. Biernat is in a different situation. There is no way that his answer to the question could be understood as true. Though it is a complicated question, it is not so "confusing and ambiguous," id. at 104, that the answer of "no" could be found literally true.

## B.     Thomas Martin

### 1.     Standard of Review

"We review a district court's factual findings in support of an obstruction of justice enhancement for clear error." United States v. Flores, 362 F.3d 1030, 1037 (8th Cir. 2004) (quoting United States v. Molina, 172 F.3d 1048, 1058 (8th Cir.1999)). "We review the application of the sentencing guidelines to the facts de novo. " Id. (quoting United States v. O'Dell, 204 F.3d 829, 836 (8th Cir. 2000)).

### 2.     Analysis

The Guideline concerning obstruction of justice reads:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

U.S. Sentencing Guidelines Manual §3C1.1 (2003). A non-exhaustive list of examples of conduct to which this section applies appears in Application Note 4.

This list includes "producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding." Id. § 3C1.1 cmt. n.4(c). It also lists the following conduct as falling under the section:

> [D]estroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding (e.g., shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence), or attempting to do so; however, if such conduct occurred contemporaneously with arrest (e.g., attempting to swallow or throw away a controlled substance), it shall not, standing alone, be sufficient to warrant an adjustment for obstruction unless it resulted in a material hindrance to the official investigation or prosecution of the instant offense or the sentencing of the offender;

Id. § 3C1.1 cmt. n.4(d).

On appeal, Martin argues that an obstruction of justice enhancement requires proof of illicit wilfulness and materiality and that the government did not meet this burden of proof. He also argues that the obstruction of justice enhancement should not apply because the government was not prejudiced by his actions. We find these arguments unpersuasive.

First, Martin argues that his conduct was not willful. Martin correctly points out that the term "willful" has a "a 'wide variety of definitions'" in the case law. United States v. Oppedahl, 998 F.2d 584, 585 (8th Cir. 1993) (citation omitted). However, it is difficult to imagine a definition of "willful" that would exclude Martin's conduct here. Even the cases Martin cites put Martin's actions squarely in the category of "willful" behavior. As stated in one such case:

> It is true that the guideline text incorporates a requirement of "willful" conduct. Indeed, we have recognized that "the term 'willfully' should be reserved for the more serious case, where misconduct occurs with

knowledge of an investigation, *or at least with a correct belief that an investigation is probably underway*."

Brown v. United States, 169 F.3d 531, 536 (8th Cir. 1999) (quoting Oppedahl, 998 F.2d at 586). Martin's conduct was the "more serious case." Martin clearly knew or believed an investigation was underway when he stated he planned to destroy evidence. In fact, the government subpoena was the subject of the taped conversation in which he made those statements. Arranging payment by Daniel Hinton happened subsequently, so Martin also knew of the investigation when he told Daniel Hinton to backdate the checks.

Next, he argues that "[i]f Mr. Martin's conduct did not impede the investigation in a material way, he did not obstruct justice." Here, Martin attempts to apply an exception to his case that is only available for those who destroy or conceal documents contemporaneously with arrest. Section 3C1.1's Application Note 4(d) states that destroying or concealing evidence constitutes obstruction,

> however, if such conduct occurred contemporaneously with arrest (e.g., attempting to swallow or throw away a controlled substance), it shall not, standing alone, be sufficient to warrant an adjustment for obstruction unless it resulted in a material hindrance to the official investigation or prosecution of the instant offense or the sentencing of the offender[.]

Because Martin's actions were not contemporaneous with arrest, the exception cannot apply.

In addition, Martin argues that backdating the checks was "mere tinkering" and did not warrant the obstruction of justice enhancement. However, we find the backdating of the check qualified as "producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding," which is expressly included under the obstruction of justice guideline. U.S. Sentencing Guidelines Manual § 3C1.1 cmt. n.4(c).

**C.      The Government's Cross-Appeal—Biernat's Minor Role Adjustment**

**1.      Standard of Review**

"It is well-established that a district court's determination of whether a defendant was a minor participant may only be reversed if clearly erroneous." United States v. Johnson, 358 F.3d 1016, 1017 (8th Cir. 2004). "A finding is clearly erroneous when the reviewing court, on the basis of all the evidence, is left with the definite and firm conviction that a mistake has been made." United States v. Wells, 127 F.3d 739, 745 (8th Cir. 1997).

**2.      Analysis**

Biernat was sentenced as a "minor participant" in the crime, and thus received a two-level decrease in his offense level at sentencing. A minor participant is one "who is less culpable than most other participants, but whose role could not be described as minimal." U.S. Sentencing Guidelines Manual § 3B1.2 cmt. n.5. A defendant whose participation is minimal is "plainly among the least culpable of those involved in the conduct of a group" and this deduction is used when the defendant lacks "knowledge or understanding of the scope and structure of the enterprise and of the activities of others." Id. § 3B1.2 cmt. n.4.

The government argues that Biernat did not deserve the two-level adjustment. "'The propriety of a downward adjustment is determined by comparing the acts of each participant in relation to the relevant conduct for which the participant is held accountable and by measuring each participant's individual acts and relative culpability against the elements of the offense.'" Johnson, 358 F.3d at 1018 (quoting United States v. Ramos-Torres, 187 F.3d 909, 915 (8th Cir. 1999)).

At sentencing, the district court stated its reasons for awarding Biernat the two-level adjustment. The district court found that the scheme to provide free plumbing

was Martin's idea, and that it was Martin who was the motivating factor behind it. While Martin arranged for the plumbing work to be done, and Martin arranged for payment to be drawn from the Union's market recovery fund, Biernat was a passive recipient of these services. The district court therefore found that Biernat was less culpable than Martin, and applied a two-level adjustment to Biernat's sentence. We agree with the district court's analysis and find that the district court's application of the minor role adjustment was not clearly erroneous.

We therefore affirm the judgment of the district court.

_____