**UNITED STATES of America,**
**Plaintiff,**

v.

**Lorman James OWLBOY,**
**Sr., Defendant.**

No. C2–04–183.

United States District Court,
D. North Dakota,
Northeastern Division.

April 21, 2005.

Steven J. Simonson, for Defendant.

Brett M. Shasky, U.S. Attorney's Office, Fargo, ND, for Plaintiff.

Memorandum Opinion and Order
Denying Motion to Suppress

ERICKSON, District Judge.

Before the Court is a motion to suppress statements that were not electronically recorded, and which Defendant argues were not voluntary but instead executed according to a "deal" with law enforcement officers (doc. # 18). The United States filed a

brief in response, arguing there is no federal requirement that statements be electronically recorded, that the written statements were voluntary, and that Defendant lacks standing to object to a written statement executed by his son. A hearing was held on April 19, 2005, during which these issues were taken under advisement. This memorandum opinion and order follows.

## SUMMARY OF DECISION

Because there is no federal right to have custodial interrogations electronically recorded, Defendant's motion to suppress statements on the basis that his due process rights were violated is DENIED. In addition, after considering the testimony of two law enforcement officers and Defendant, the Court finds the law enforcement officers' version concerning the manner in which the statements were obtained more credible and that the interview and subsequent statements by Defendant were voluntary and therefore are admissible. Thus, Defendant's motion to suppress all statements made by Defendant and his son is DENIED. Because the Court finds the statements were voluntarily made and are admissible, the United States' argument regarding the standing of Defendant to contest statements made by his son is rendered moot.

## BACKGROUND

On September 23, 2004, at approximately 8:40 p.m., law enforcement officers executed a tribal search warrant at Defendant's residence. The search warrant was issued to look for stolen speakers, illegal drugs, and drug paraphernalia. Eight federal, tribal, and state law enforcement officers assisted in executing the search warrant. Once the officers arrived at Defendant's residence, they knocked on the door, announced their presence, and entered the residence. When the officers entered the residence, Defendant and his 16–year old son were present.

The officers entered Defendant's residence with their guns drawn and ordered Defendant and his son to the floor. Defendant was handcuffed only until the residence was secured, which lasted from five to ten minutes. After securing the residence, Defendant was seated on the couch. During the search of the residence, a bag of marijuana was found in Defendant's son's jacket pocket, 15 marijuana joints were found in the kitchen area of the house, and two roaches were found in the kitchen.

Bentley Grey Bear, a special agent for the Bureau of Indian Affairs, testified that Defendant approached him during the search and said he had information and wanted to talk. Special Agent Grey Bear then approached Special Agent Ron Miller from the Federal Bureau of Investigations about conducting an interview of Defendant. Special Agent Miller testified he decided an interview should not be conducted until the search was completed.

After the search was completed, Special Agents Grey Bear and Miller interviewed Defendant in a back bedroom of the residence. The interview last from 30 minutes, according to Defendant, to about an hour, according to Special Agent Miller. The size of the bedroom in which the interview took place was estimated to be about 12 feet by 12 feet. The room contained a bed along a wall, a chair, and another chair or box. It was dark outside at the time of the interview, but the room had a light. There was a window and only one doorway. During the interview, Defendant sat in a chair, Special Agent Grey Bear sat on the bed, and Special Agent Miller sat on another chair or box. Special Agent Grey Bear testified that Defendant's path to the door was not impeded by the officers or anything else.

Prior to asking any questions, Special Agent Miller testified Defendant was told

he did not have to talk to the officers, he was advised that he was not under arrest, that he was free to leave, that no promises could be made but any cooperation would be made known to the prosecutor, and that "honesty is the best policy." Special Agent Grey Bear testified a "Griffin" warning was administered and Defendant was not informed of his right to counsel under Miranda because Defendant was not "in custody." During the interview, Special Agent Grey Bear took "field notes" and then reduced to writing a more concise account of Defendant's statements. Defendant elected to have Special Agent Grey Bear write out the statement instead of writing it out himself. After Special Agent Grey Bear wrote the statement, he read each paragraph to Defendant and informed Defendant that he could make any corrections he wanted. Special Agent Grey Bear also asked Defendant to initial each paragraph if he agreed with the statements in the paragraph. Defendant initialed each paragraph, added two sentences in his own handwriting which stated he was sorry for getting his son involved, and signed the statement.

Special Agents Grey Bear and Miller testified that no threats, promises, or deals were made to Defendant. Nevertheless, as a consequence of Defendant's actions, Special Agent Grey Bear testified that he might have informed Defendant that he could lose his house or custody of his children. Defendant and his son were not arrested at the conclusion of the interview.

A couple weeks after the search and interview, Special Agent Grey Bear contacted Defendant for permission to obtain a statement from his son. On October 13, 2004, Defendant allowed his son to be interviewed by Special Agent Grey Bear at Defendant's residence. Special Agent Grey Bear talked to Defendant's son while Defendant was present and reduced to writing a statement. Like the manner in which Defendant's statement was prepared, Special Agent Grey Bear wrote out a statement and told Defendant's son that he could make any corrections he wanted. In addition, Special Agent Grey Bear asked Defendant's son to initial each paragraph if he agreed with the statements in the paragraph. Defendant's son made one correction regarding the unit number where he lived. Both Defendant and his son initialed each paragraph. Defendant's son also added a sentence in his own handwriting that said he had nothing else to add. At the conclusion of the statement, both Defendant and his son signed the statement.

In contrast to the law enforcement officers' account, Defendant contends both his statement and the statement of his son were not voluntarily executed. Defendant testified he was threatened by law enforcement officers that he could lose his children and his house if he did not cooperate with them. Defendant further testified that he never gave the information contained in his statement but agreed to the statements because that was what the officers wanted as part of a "deal." Defendant testified "the deal" he made with Special Agent Grey Bear was that he would sign the statement, even if the information contained in the statement was not true, and give information on others dealing drugs in exchange for keeping him and his son from being charged or going to jail.

Defendant argues all statements he and his son made should be suppressed because due process requires that interrogations be recorded and also because the statements were not voluntary.

## ANALYSIS

1. Due Process and Recording Interrogations

■ Defendant urges this Court to follow the example of the Supreme Courts of

Minnesota and Alaska and rule that, in the absence of an electronic record of the interrogation, the Court should suppress the statements as a violation of due process. See *State v. Scales*, 518 N.W.2d 587 (Minn. 1994) (interpreting the Minnesota constitution and determining that custodial interrogations must be recorded when feasible); *Stephan v. State*, 711 P.2d 1156 (Alaska 1985) (finding that non-recorded statements made during the course of a custodial interrogation should be suppressed because they were obtained in violation of the due process clause of the Alaska constitution). Although the advocated rule may be a desirable one, Defendant has not pointed to any Supreme Court or other federal precedent to support his argument. Other federal courts addressing this issue have concluded there is no federal right to have custodial interrogations recorded. See *United States v. Montgomery*, 390 F.3d 1013, 1017 (7th Cir.2004) (refusing to require the electronic recording of all interrogations); *Reinert v. Larkins*, 379 F.3d 76, 94 n. 4 (3d Cir.2004) (declining to infer a federal right to have custodial interrogations recorded); *United States v. Yunis*, 859 F.2d 953, 961 (D.C.Cir.1988) (determining that there is no constitutional requirement that confessions be recorded by any particular means); *Mastin v. Senkowski*, 297 F.Supp.2d 558, 606 (W.D.N.Y. 2003) (concluding the defendant's argument that he was entitled to have an adverse inference drawn against the prosecution based on the police officer's failure to videotape the interrogation does not present a claim of constitutional dimension); see also *United States v. Zamudio*, No. 99–2256, 2000 WL 488474, *2, 2000 U.S.App. Lexis 8235, at * 8 (10th Cir. Apr. 26, 2000) (stating the Fifth Amendment does not require the recording of post-arrest statements); *Ridgley v. Pugh*, No. 98–35429, 1999 WL 278108, **1-2, 1999 U.S.App. Lexis 7408, at *4 (9th Cir. Apr. 12, 1999) (concluding habeas claim based on police officer's failure to record a portion of petitioner's interrogation does not state a violation of a federal constitutional or statutory right).

Although affording the Court the benefit of watching or listening to a videotaped or audiotaped statement would be invaluable in cases such as this one, *United States v. Lewis*, 355 F.Supp.2d 870 (E.D.Mich.2005), at this time there is no federal requirement that interviews or interrogations be recorded. Thus, Defendant's motion to suppress statements based on a violation of due process is DENIED.

2. Voluntariness of the Statements

■ Defendant argues his statements were involuntary as there was an unannounced search of his residence, which resulted in him being ordered to the floor by gunpoint. Thereafter, statements were executed under the threat of loss of Defendant's house and his children, and as part of negotiations to avoid Defendant and Defendant's son from being taken to jail. Defendant seeks to suppress all statements made by him and his son.

To be admissible at trial, a statement must be voluntary. *United States v. Jorgensen*, 871 F.2d 725, 729 (8th Cir.1989). Courts weight the voluntariness of a confession based on the totality of the circumstances. *United States v. LeBrun*, 363 F.3d 715, 724 (8th Cir.2004) (en banc). The United States bears the burden of persuasion and must prove by a preponderance of the evidence the voluntariness of the challenged statements. *Id.*

In considering voluntariness, two factors should be considered: the conduct of the law enforcement officials and the capacity of the suspect to resist pressure to confess. *Jorgensen*, 871 F.2d at 729 (citing *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986)). "A statement is involuntary when it was extracted by

threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *Simmons v. Bowersox*, 235 F.3d 1124, 1132 (8th Cir.2001) (citing *U.S. v. Pierce*, 152 F.3d 808, 812 (8th Cir.1998)). Not all psychological tactics, such as making false promises, playing on emotions, and using family render a confession involuntary. See LeBrun, 363 F.3d at 724 (citing *United States v. Astello*, 241 F.3d 965, 967–68 (8th Cir.2001)). Moreover, a promise of leniency does not necessarily make a statement involuntary. *Astello*, 241 F.3d at 968. Such tactics will not "render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne." *Jenner v. Smith*, 982 F.2d 329, 334 (8th Cir.1993) (citations omitted).

In this case, Special Agent Grey Bear testified that it was Defendant who approached him and wanted to talk because he had information to disclose. Further, the two law enforcement officers that interviewed Defendant testified they informed Defendant that he did not have to speak with the officers, that he was free to leave at anytime, and that although no promises could be made to him, any cooperation would be made known to the prosecutor. The officers further testified that they did not make any threats toward Defendant, promise him anything, or make any "deal" with the Defendant in exchange for information. Special Agent Grey Bear stated that he might have informed Defendant that, as a consequence of his drug activities, Defendant could lose his house or custody of his children.

In contrast, Defendant testified the officers threatened him by stating he could lose his house or custody of his children if he did not cooperate with them. Defendant also testified that his statements were part of a "deal" he made with Special Agent Grey Bear. The "deal" Defendant allegedly made was that he would agree to sign the statements prepared by Special Agent Grey Bear and to provide information on other drug activities and in exchange Defendant and his son would not be taken to jail or charged. However, Defendant also testified he agreed to take the blame for the marijuana found in the residence and on his son because he did not want his son to go to jail. Defendant contends he kept his part of the deal and had a couple conversations with Special Agent Grey Bear during which he provided information on other individuals involved in drug activities, specifically an individual named Felix, and also met Special Agent Grey Bear in the country one time to provide information. However, Defendant testified he was later labeled as a "narc" so he could not help the officers anymore.

After listening to the testimony of Special Agents Grey Bear and Miller and Defendant, the Court finds the testimony by the officers to be more credible. The "deal" alleged by Defendant is that he would agree to the information in the statements, even if it was false, and provide additional information on other individuals involved with drugs in exchange for keeping himself and his son out of jail or from being charged. However, if the information contained in Defendant's statement as part of a deal was all false, then the statements would do the law enforcement officers little good unless the officers intended all along to renege on the deal. Under the facts and circumstances presented in this case, the Court does not find it very plausible that the officers made a deal with Defendant and had him sign statements, even if they were false, because the officers intended to later renege on the deal and charge Defendant.

Instead, the law enforcement officers' account that Defendant agreed to be inter-

viewed by the officers and provided the information contained in the statements seems to be more credible. Special Agent Grey Bear testified that he asked Defendant to initial each paragraph if he agreed with the statements in it. Defendant initialed each paragraph, added two sentences in his own handwriting indicating he was sorry for getting his son involved, and signed the statement. In addition, Defendant agreed to let his son be interviewed and Defendant as well as his son initialed each paragraph of Defendant's son's statement and both signed at the end of the statement.

After carefully considering the testimony at the hearing, the statements and arguments of counsel, and the entire file, the Court finds the statements were given voluntarily and the law enforcement officers did not coerce or threaten Defendant into making the statements. Accordingly, Defendant's motion to suppress all statements made by him and his son is DENIED.

3. Standing to challenge statements made by Defendant's son

The United States raised the issue of Defendant's standing to challenge statements made by his son. Defendant responded by arguing his son's statements have been adopted as Defendant's own statement once Defendant initialed and signed each paragraph of his son's statement. Although the issue of adoption by incorporation of one's signature poses an interesting question, this issue is rendered moot by the Court's finding that the statements were made voluntarily and are admissible for that reason.

## CONCLUSION

For the reasons stated above, Defendant's motion to suppress statements on the basis that his due process rights were violated is DENIED; Defendant's motion to suppress statements which were not voluntary is DENIED; and the United States' argument regarding standing by Defendant to contest his son's statements is rendered MOOT.

IT IS SO ORDERED.