# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 99-2443

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Northern |
| | * | District of Iowa. |
| Ramiro Astello, | * | |
| | * | |
| Defendant - Appellant. | * | |

_____

Submitted:  February 15, 2000

Filed:   March 5, 2001

_____

Before BEAM and JOHN R. GIBSON, Circuit Judges, and PRATT,[1] District Judge.

_____

JOHN R. GIBSON, Circuit Judge.

Ramiro Astello appeals the district court's[2] denial of his motion to suppress two statements he made to the police in conjunction with an investigation of the kidnapping

_____

[1]The Honorable Robert W. Pratt, United States District Judge for the Southern District of Iowa, sitting by designation.

[2]The Honorable Mark W. Bennett, United States District Judge for the Northern District of Iowa.

and murder of Sky Erickson. The statements were admitted at trial, and the jury convicted Astello of kidnapping, conspiracy to commit kidnapping, and use of a firearm in relationship to a crime of violence, in violation of 18 U.S.C. §§ 1201(a), 1201(c), and 924(c) (1994 & Supp. IV 1998). Astello received a mandatory life sentence. We affirm.

On June 6, 1997, Erickson was taken from Iowa to an abandoned Minnesota farmhouse, where he was shot and killed. After an investigation and pursuant to a warrant, the police arrested Astello at his home in Estherville, Iowa on June 19. An Estherville officer took Astello to the Emmet County Sheriff Chief Deputy's office. At the office, FBI agent Robert Birnie and Minnesota agent Don Enger informed Astello of his <u>Miranda</u> rights.[3] Astello signed a waiver-of-rights form at approximately 6:45 p.m.

During the questioning, the agents informed Astello that he had been arrested for kidnapping that resulted in death and that the penalty for the crime in Iowa was life in prison with no chance of parole. They also told him that he could be charged under Minnesota or federal law for the same crime. At first, Astello denied that he was involved in the kidnapping and murder. Less than an hour after the interrogation began, Astello began telling the agents what happened the night of the kidnapping. The interrogation concluded at 9:26 p.m.

Later that night, Astello asked to see the two agents again. He met with them on June 20 and supplemented his earlier statement with additional details of Erickson's kidnapping and death.

---

[3]<u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). Astello had been informed of his rights at the time of his arrest as well.

Before trial, Astello moved to suppress the two statements as involuntary. The district court referred the motion to a magistrate judge, who found that the first statement was involuntary but that the second was not. The district court rejected the magistrate's finding that the June 19 statement was coerced, held that both statements were voluntary, and denied Astello's motion to suppress. Astello appeals, arguing that the agents coerced his first statement and that this tainted his second statement.

We review the district court's ultimate determination of voluntariness de novo, but we review the factual findings underlying that determination for clear error. United States v. Otters, 197 F.3d 316, 317 (8th Cir. 1999). The government must prove by a preponderance of the evidence that the challenged statements were voluntary. Lego v. Twomey, 404 U.S. 477, 489 (1972).

It is undisputed that Astello received the Miranda warnings and waived his rights at the beginning of the June 19 interrogation. "[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare." Berkemer v. McCarty, 468 U.S. 420, 433 n.20 (1984).

To determine whether this is one of those rare cases, we consider the totality of the circumstances surrounding Astello's confession, focusing on both the conduct of the agents and Astello's capacity to resist pressure to confess. See United States v. Kilgore, 58 F.3d 350, 353 (8th Cir. 1995). "The appropriate test for determining the voluntariness of a confession is whether the confession was extracted by threats, violence, or direct or implied promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired." Id. (internal quotations and citation omitted).

In support of his argument that his June 19 statement was involuntary, Astello relies most heavily on the fact that he was not allowed to see his mother. During the

interrogation, Astello, who was eighteen years old, asked to see his mother: "Well, if you give me a last chance to talk to my mom at least right now before I say anything, cuz I think I'll just stick with the truth then." After several more minutes of discussion between Astello and the agents, Astello repeated his request: "I want to talk to my mom first. Then I'll talk. Yeah, I was involved in it, that's all. You wanna hear that? I was involved in it. . . . I know what went on and everything about it. I told you I need to talk to my mom first." When Enger asked what he wanted to talk to his mother about, Astello responded, "Just to tell her I'm--what's goin' on." Enger then told Astello that he could talk to his mother after he told them what happened, and Astello agreed. While Astello may have been seeking guidance, his words indicate that he asked to see his mother after he had decided to confess. After considering all the circumstances, we hold that the agents' failure to allow Astello to speak to his mother does not render his statement involuntary. Cf. United States ex rel. Riley v. Franzen, 653 F.2d 1153, 1160-62 (7th Cir. 1981) (adopting a case-by-case approach to determine whether denial of a juvenile's request for a parent renders a confession inadmissible); Rone v. Wyrick, 764 F.2d 532, 535 (8th Cir. 1985) (parental presence not mandatory for juvenile's confession to be admissible in federal court).

Astello also alleges that the agents improperly used several tactics to coerce him to confess. He argues that they placed time constraints on his decision whether to talk to them, thus subjecting him to psychological pressure; they made false promises; and they played on his emotions and used his respect for his family against him. Obviously, interrogation of a suspect will involve some pressure because its purpose is to elicit a confession. In order to obtain the desired result, interrogators use a laundry list of tactics. See Richard A. Leo, Inside the Interrogation Room, 86 J. Crim. L. & Criminology 266, 278 (1996). "Numerous cases have held that questioning tactics such as a raised voice, deception, or a sympathetic attitude on the part of the interrogator will not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne." Jenner v. Smith, 982 F.2d 329, 334 (8th Cir. 1993).

Here, the agents used a train analogy, telling Astello that the train was leaving the station and those who told the truth would be on the train while those left behind at the station would be charged with the crime. They said that the train was getting crowded, and that those who were on the train would testify against him. Certainly, these statements may have influenced Astello's decision to tell the truth. Having carefully read and listened to the June 19 interrogation in its entirety, however, we conclude that the statements were "not so coercive as to deprive [Astello] of [his] ability to make an unconstrained decision to confess." United States v. Mendoza, 85 F.3d 1347, 1351 (8th Cir. 1996).

At times during the interrogation, the agents seemed to imply that Astello would get something less than life in prison if he confessed. On more than one occasion, however, they specifically told Astello that they could not make any promises. In any event, a promise of leniency does not necessarily make a statement involuntary. See Kilgore, 58 F.3d at 353. In Sumpter v. Nix, 863 F.2d 563, 565 (8th Cir. 1988), we concluded that a confession was voluntary even though the defendant alleged that his interrogators made implied promises of leniency. The defendant's knowledge that confessing would be risky supported our conclusion. Id. Similarly, Astello knew the risks of confessing. At one point during the questioning, he said, "If I say the truth, I'm still goin' in." Later in the interrogation, he stated, "Yeah, I'm gonna tell the truth, because I guess we're all gonna be punished for what we did . . . ."

The agents told Astello that he had disgraced his family and that his lies dishonored his family. They also told him that he had broken his father's heart. Astello did not seem to be affected in the least by this "family dishonor" interrogation tactic. Immediately after Enger said, "[W]hy do you persist in bringing dishonor to your family, persist in bringing dishonor to you by lyin'? I mean you have nothing to gain. . . . [Y]ou're the last of the tough guys, and everyone that is tougher than you is goin' down? Come on," Astello commented, "That's a shame, huh?" and laughed. Astello's response indicates that his will was not overborne.

-5-

Finally, Astello argues that his age, limited education, and lack of experience with the criminal justice system weigh in favor of involuntariness. Astello turned eighteen only two weeks before he confessed to his involvement in the kidnapping. He had completed eleventh grade and had been arrested on two different dates for three crimes: possession of stolen property, assault, and disorderly conduct. These charges were waived from juvenile court and eventually dismissed after he was arrested in this case. The district court found that Astello was "a mature, self-assured eighteen year old person. It is clear that defendant had the capacity to understand, and did understand, what was being said at the interview, and that he had the capacity to measure his response." The district court also found that Astello's "prior dealings with the criminal justice system would have allowed him to more fully comprehend the serious situation in which he found himself and [rendered him] less likely to be intimidated by the agents." These findings are not clearly erroneous, and they support the district court's determination that Astello's June 19 statement was voluntary.

Astello knew his rights and understood the consequences of committing the crime for which he was arrested. He was questioned for less than three hours and was not mistreated in any way. Police interrogation tactics are designed to elicit a response, and the fact that the tactics produced the intended result here does not make Astello's confession involuntary. This, of course, does not mean that we condone any of the tactics used by the agents in this case. We see no indication, however, that Astello's will was overborne and his capacity for self-determination critically impaired.

With regard to the June 20 statement, Astello argues only that the coercion that led to his first statement tainted the second. As we have concluded that his first statement was voluntary, there is no question that the second was admissible as well.

We affirm the judgment of the district court.

-6-

PRATT, District Judge, concurring in part and dissenting in part.

Astello's second, unwarned confession given on June 20, 1997 was given freely and voluntarily, and therefore the district court was correct in not suppressing that confession. In this respect, I concur with the majority's opinion. As to Astello's June 19, 1997 statement, however, I respectfully dissent. I believe that Astello's statements given to the interviewing agents on June 19th were the product of compulsion, and therefore obtained in violation of his Fifth Amendment rights.

I.

It is undisputed that after reading Astello his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), and obtaining from him a signed waiver form, agents Enger and Birnie launched into a focused interrogation of Astello, quizzing him about the events and circumstances surrounding the June 6th murder.

A review of the tape and transcript of the June 19th interrogation reveals that the agents repeatedly tried, but failed, to get Astello to make inculpatory statements about him and others involved. During the first hour of the interrogation, they employed, as the majority puts it, a "laundry list of tactics," *ante* at 4, to elicit from Astello a confession. These tactics included: use of a train analogy ("you still have the opportunity to get on that train, and tell us what happened"); implied promises of leniency (cooperation may result in "something less" than mandatory life sentence); accusations that the Defendant was a "classic" liar; sympathetic appeals to the Defendant ("[we] don't think that you're a bad guy"; "things happen"; "you just happened to be at a bad place at a bad time"); and guilt ("You've disgraced" your father who is "too nice a person" and "[y]our mother [who] is too nice a lady").

Throughout this initial phase of the interrogation, Astello answered the questions posed to him. He never told the agents to stop their questioning. Astello consistently denied his involvement in the June 6th murder.

After about an hour, however, the tenor of the interrogation changed. Astello signaled his intention to suspend the questioning and speak to his mother first before saying anything else to the agents. Astello requested three times to speak with his mother before telling his story, but to no avail. The relevant exchange, which is omitted from the majority's opinion, is as follows:

Astello[4]: Well, if you give me a last chance to talk to my mom at least right now before I say anything, cuz I think I'll just stick with the truth then.

Enger: You wanna talk to your mom first?

Astello: Yeah.

Enger: What's your feeling?

Astello: Cuz I guess this ain't gonna make any difference I guess. If I'm lying, I'm still goin' in. If I say the truth, I'm still goin' in, so what's the difference.

Enger: Well, you're goin' in. * * *

Birnie: You're not gonna be able to hide behind your mom's skirt anymore. . . . [Y]ou can pull the wool over your mom's eyes; you haven't done it to your dad.

Enger: Other than breakin' his heart.

Birnie: But your mom's not gonna be able to come and bail you out this time. What's it gonna be?

Astello: I told you already. I want to talk to my mom first. Then I'll talk. Yeah, I was involved in it, that's all. You wanna hear that? I was involved in it.

Enger: We know that.

Astello: I know what went on and everything about it. I told you I need to talk to my mom first.

Enger: Let me ask you what you wanna talk to your mom about. You're a big boy now.

---

[4] In the transcript, the names of the interviewers are denominated by "DE" and "BB" for Don Enger and Bob Birnie respectively. The Defendant is denominated as "RA." For clarity, I cite to their last names only.

Astello:  Yeah, I know I am.

Enger:  Okay.

Astello:  Just to tell her I'm – what's going' on.

Enger:  Why don't you do this.

Astello: Yeah.

Enger:  Why don't you tell us what happened, and when we're done, we'll give you the opportunity to talk to your mom.

Astello:  Okay.

Enger:  You can have a minute with her.

Astello:  Just a minute?

Enger:  Well, you can have a reasonable amount of time, how's that?

Astello:  Okay.

Later that same day, Astello confessed, implicating himself in the kidnaping and murder of Sky Erickson.  The June 19th interrogation concluded at about 9:30 p.m., approximately 3 hours after it began.

Later that night, Astello requested to speak with agents Birnie and Enger again about the murder.  They met with Astello at a different holding facility at 9:43 a.m. on June 20, 1997.  The agents did not give fresh *Miranda* warnings.   Astello provided additional details surrounding his involvement in the June 6th murder.  This second interview, which was also tape recorded, lasted approximately 90 minutes.

II.

In *Miranda*, the Supreme Court observed:

Once warnings have been given, the subsequent procedure is clear.  If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment

-9-

privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise.  Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.

384 U.S. at 473-74.

In *Michigan v. Mosley*, 423 U.S. 96 (1975), the Supreme Court clarified this quoted passage.  "The critical safeguard identified in the passage at issue is a person's 'right to cut off questioning.'" *Id*. at 103.   The "admissibility of statements obtained after the person in custody has decided to remain silent," held the Court, "depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Id*. at 104.

Factors relevant in determining whether the accused's right to cut off questioning has been "scrupulously honored" are: "a) whether the police immediately ceased the interrogation upon defendant's request, b) whether they resumed questioning only after the passage of a significant period of time and provided fresh *Miranda* warnings, and c) whether they restricted later interrogation to a crime that had not been the subject of the first interrogation." *Jackson v. Wyrick*, 730 F.2d 1177, 1179 (8th Cir. 1984) (citing *Mosley*, 423 U.S. at 106)).  The emphasis typically is on the first three factors, the last factor being non-dispositive.  *See, e.g., Brown v. Caspari*, 186 F.3d 1011, 1015 (8th Cir. 1999); *Stumes v. Solem*, 752 F.2d 317, 322 (8th Cir. 1985).

Ordinarily, "to invoke one's right to remain silent, one must unequivocally express his desire to remain silent." *Simmons v. Bowersox*, 235 F.3d 1124, 1131 (8th Cir. 2001) (citing *United States v. Al-Muqsit*, 191 F.3d 928, 936 (8th Cir. 1999)); *United States v. Johnson*, 56 F.3d 947, 955 (8th Cir. 1995) ("clear, consistent expression of a desire to remain silent" required) (citation omitted). However, when the assertion of one's Fifth Amendment right is ambiguous or equivocal, the law permits further inquiry, but only to clarify whether the accused is in fact invoking that right. *See Simmons*, 235 F.3d at 1132 n.3 (after an ambiguous assertion of right to remain

silent, questioning "should immediately cease and [the agent] should then inquire of the suspect as to the correct interpretation of the statement") (citation omitted); *Bobo v. Kolb*, 969 F.2d 391, 396 (7th Cir. 1992) (same); *Campaneria v. Reid*, 891 F.2d 1014, 1021 (2d Cir. 1989) (same), *cert. denied*, 499 U.S. 949 (1991). The heightened attention the law accords even to inarticulate requests to be silent is consistent with that right's undergirding premise that "[t]hrough the exercise of his option to terminate questioning," it is the accused, and *not* the interrogators, who "control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation." *Mosley*, 423 U.S. at 103-04.

In this case, once informed of his rights, Astello freely answered the questions put to him during the first hour of the interrogation. There then came a point during the interrogation when Astello decided to halt the direct questioning about his involvement in the crime and talk with his mother. Astello stated: "[I]f you give me a last chance to talk to my mom at least right now before I say anything, cuz I think I'll just stick with the truth then." At this juncture, the mandate of *Miranda* and *Mosley* required the agents to immediately terminate questioning, *see, e.g., Otey v. Grammar*, 859 F.2d 575, 579 (8th Cir. 1988) (when defendant "appeared unwilling to answer specific questions, interrogation immediately ceased"), *cert. denied*, 497 U.S. 1031 (1990); *United States v. Udey*, 748 F.2d 1231, 1242 (8th Cir. 1984) (when defendant "expressed some unwillingness to talk, the interrogation was terminated"), *cert. denied*, 472 U.S. 1017 (1985), and resume only after a significant period of time had passed and fresh *Miranda* warnings given. *See also United States v. Cody*, 114 F.3d 772, 775-76 (8th Cir. 1997).

True, Astello's was not the clearest invocation of the right to remain silent, though this fact should hardly work an automatic prejudice against him. *See Emspak v. United States*, 349 U.S. 190, 194 (1955) ("ritualistic" or "talismanic" phrases are not always necessary before one invokes his Fifth Amendment privilege against self-incrimination). At the very least, any follow-up questions should have been used only to clarify whether Astello was in fact invoking his Fifth Amendment right. For

-11-

example, in *Johnson*, 56 F.3d at 955, when asked if he wished to waive his rights, the defendant responded equivocally: "[I]f I tell you anything, you're just going to use it against me later, aren't you? . . . [Y]ou guys have all the evidence against me. I don't need to make any statement. I don't need to say anything." After clarifying questions from agents, the defendant then stated: "I know I'm going to jail for a long time, the rest of my life, I can't help myself by talking to you." *Id*. We determined that answer to be a "clear" invocation of the defendant's Fifth Amendment rights. *Id*. The agents "acted prudently," we observed, "by attempting to clarify whether Johnson was asserting his right to silence and by not further questioning him after it was clear that Johnson did not want to talk." *Id*. (citation omitted).

None of the procedures prescribed by *Mosley* were followed. Instead, sensing that a confession was close at hand, the agents redoubled their efforts to convince Astello to talk:

Astello: I told you already. I want to talk to my mom first. Then I'll talk. Yeah. I was involved in it, that's all. You wanna hear that? I was involved in it.

Enger: We know that.

Astello: I know what went on and everything about it. I told you I need to talk to my mom first.

Enger: Let me ask you what you wanna talk to your mom about. You're a big boy now.

Astello: Yeah, I know I am. * * *

Enger: Why don't you do this. . . . Why don't you tell us what happened, and when we're done, we'll give you the opportunity to talk to your mom.

Astello: Okay.

In their repeated attempts to get Astello to talk before consulting with his mother, the agents did not allow Astello to "control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation." *Mosley*, 423 U.S. at 103-04; *Campaneria*, 891 F.2d at 1021 (agent's remark that "If you want to talk to us, now is

-12-

the time to do it" was not aimed at resolving ambiguity but rather at changing defendant's mind). This is a case "where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind." *Mosley*, 423 U.S. at 105-06; *see also id.* at 102 ("To permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purpose of *Miranda* by allowing repeated rounds of questioning to undermine the will of the person being questioned."); *Wyrick*, 730 F.2d at 1179 ("Repeated interrogation despite the defendant's refusal to give a statement can violate *Miranda* . . . ."); *United States ex rel. Riley v. Franzen*, 653 F.2d 1153, 1161-62 (7th Cir.) ("[A] single request [to see one's parent] should be viewed differently than repeated requests, especially if the repetitions are in response to a series of police questions regarding the crime under investigation. Under some circumstances, the latter properly may be viewed as an invocation of the suspect's right to silence . . . ."), *cert. denied*, 454 U.S. 1067 (1981). Because Astello's right to cut off questioning was not "scrupulously honored," *Mosley*, 423 U.S. at 104, his incriminating statements of June 19, given as they were under the pressure and influence of two experienced agents, "cannot be other than the product of compulsion, subtle or otherwise." *Miranda*, 384 U.S. at 474. Therefore, this confession should have been suppressed. And for this reason, I dissent.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.