# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-2996

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Nebraska. |
| Leopoldo Sanchez, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: March 10, 2010
Filed: August 10, 2010

_____

Before SMITH, BENTON, and SHEPHERD, Circuit Judges.

_____

SMITH, Circuit Judge.

Leopoldo Sanchez, an Indian minor, was charged with assault with a dangerous weapon within Indian country and assault resulting in serious bodily injury, in violation of 18 U.S.C. §§ 2, 113(a)(3) and (6), and 1153. Sanchez moved to suppress incriminating statements made to law enforcement officers as involuntary. The district court adopted the report and recommendation of the magistrate judge that the statements be suppressed. The government filed this interlocutory appeal pursuant to 18 U.S.C. § 3731 asking this court to reverse the district court's grant of the suppression motion. We now reverse the district court's grant of the suppression motion and remand to the district court for further proceedings consistent with this opinion.

I. *Background*

A. *General Background*

On January 27, 2007, Bureau of Indian Affairs (BIA) Patrol Officer Gordon Rave and Officer Daryl Monroe of the Winnebago Tribe of Nebraska Police Department (WPD) separately investigated an accident and an assault on the Winnebago Indian Reservation in Winnebago, Nebraska. The next day, Officer Monroe interviewed witnesses relating to both the assault and the accident. Witnesses identified Sanchez as being involved in both incidents.

After witnesses identified Sanchez as the assailant, Officers Rave and Monroe went to the residence of Fred Huffman, Sanchez's grandfather, to talk to Sanchez about the assault. The officers knew that Sanchez sometimes lived with his grandfather and sometimes with his mother, Laura Huffman.[1] Officer Rave, Officer Monroe, and Huffman recalled events at the residence differently. According to Officer Rave, Sanchez was present at the residence, but his mother was not. The officers, believing Sanchez was underage, had him call Huffman to have a parent present during the interview. Sanchez called Huffman, and she returned to the residence. Prior to her arrival, Sanchez invited the officers inside the residence, but the officers did not interview Sanchez at that time. When Huffman arrived at the residence five to ten minutes later, Officer Monroe told Huffman to bring Sanchez to the police station for an interview. Officer Rave could not recall whether Officer Monroe informed Huffman of the nature of the investigation. Officers Rave and Monroe then returned to the police station. Huffman and Sanchez arrived later.

---

[1]Both officers knew Sanchez and his family personally. Officer Rave has known Sanchez his entire life. Sanchez's mother, Laura Huffman, has known Officer Rave for approximately 25 years. Officer Monroe has known Sanchez for approximately 12 years because his mother, Huffman, had previously worked for the WPD as a police dispatcher.

According to Officer Monroe, the officers never entered the residence. When Huffman arrived at the residence, they advised her that they were investigating an assault and wanted her to bring Sanchez to the police station to conduct an interview. The officers did not "command" that Huffman bring Sanchez to the station; instead, they asked in casual conversation whether Huffman would bring him. Huffman "was very cooperative" and brought Sanchez to the police station.

In contrast, Huffman testified that she was actually in the home when the police initially arrived and that Sanchez came back to her room to inform her that "the cops were there at the house and they wanted to talk to [her]." Huffman could not recall which officer was at her door. She could not recall whether one officer or two officers were present, but she did remember the conversation. The officer told Huffman to bring Sanchez to the police station. When Huffman asked why, the officer replied that she needed to bring him to the station for questioning. When she again asked why, the officer repeated his earlier statement. Huffman considered the statement to be a "directive, not a request." Huffman then told Sanchez that they needed to go to the police station and asked him why the police would want to question him. Sanchez replied that "it was probably about a fight or something." Huffman then took Sanchez to the police station.

Huffman and Sanchez arrived at the police station at 5:55 p.m. Officer Rave escorted them to the officer squad room located in the back of the station for the interview. The room is approximately 15 by 25 feet long and contains computers for officers to type their reports. No table, desk, or other furniture separated Sanchez and the officers.

At 5:58 p.m., Officer Rave read Sanchez his *Miranda* rights from a rights advisory form. Huffman and Sanchez were provided copies of the rights advisory form and followed along as Officer Rave read the form. Officer Rave read each of the rights individually and, after each one, asked Sanchez and Huffman if they understood

the statement. Sanchez responded orally to each statement, indicating that he understood his rights and that he was willing to speak to law enforcement. Sanchez signed the rights advisory form waiving his *Miranda* rights. According to Huffman, the officers told her that if she wanted to talk to her son, she was "going to have to sign that waiver." Huffman signed the waiver "because [she] wanted to find out for [her] son what had happened."

Again, the witnesses' recollection of events after Sanchez waived his *Miranda* rights differ.

### 1. *Officer Rave*

Officer Rave testified that Officer Monroe advised Huffman that the officers were conducting an investigation into an assault and that witnesses identified Sanchez as being involved. According to Officer Rave, Officer Monroe's demeanor was "calm" during this time, as he spoke with a "conversational voice" and never raised his voice, yelled, or got in Sanchez's face at any time. Instead, Officer Monroe remained seated in the chair while asking questions. Officer Rave also testified that his demeanor was "calm" during this time and that he was "just letting Officer Monroe speak while [he] listened." He said that he never raised his voice when asking questions or got in Sanchez's face; instead, he remained seated. Officer Rave stated that Huffman's demeanor was "calm" at the beginning of the interview, although she did not really comprehend what the interview was about until Officer Monroe talked to her. When she learned of the interview's purpose, Huffman acted "confused," according to Officer Rave. The officers advised Huffman that they wanted to hear Sanchez's version of events in light of the allegations made against him, and Huffman permitted the interview to continue. According to Officer Rave, Huffman directed her son to "tell the truth." Officer Rave described Sanchez as not making eye contact at the outset of the interview. He also said that Sanchez made inconsistent statements, changing his description of events. According to Officer Rave, Sanchez denied

-4-

involvement in the assault and did not appear intimidated by the officers when answering questions.

According to Officer Rave, during the interview, the officers mentioned the victim's family might retaliate—specifically, the victim's brother who had a reputation as a troublemaker in the community. Officer Rave was concerned about possible retaliation against Sanchez or his family and communicated that concern to Sanchez and Huffman "[b]ecause [he] kn[e]w [Sanchez's] little sisters and [he] just didn't want nothing bad to happen to them." He claims that he did not use this as a tactic to coerce an admission from Sanchez.

Additionally, Officer Rave recalls that during the interview, Officer Monroe showed Huffman a picture of the assault victim, which Sanchez "glanced" at. Officer Rave did not know what prompted Officer Monroe to do that. After Officer Monroe showed the picture to Huffman, she advised Sanchez to "tell the truth." Sanchez reacted by "put[ting] his head down and then ma[king] a statement to [the officers]." Officer Rave testified that Sanchez said, "I did it." Huffman then started crying and left the room. Officer Rave did not know where Huffman went, as he stayed in the room. He recalled that Huffman returned to the interview room "[a] little more than two minutes" later. But the police station activity log indicates that Huffman left the police station at 6:24 p.m.—29 minutes after Huffman and Sanchez arrived at the police station. Officer Monroe also left the room to secure a room for Sanchez.

Officer Rave then handcuffed Sanchez and continued questioning Sanchez regarding his involvement in the assault. Sanchez admitted to being present at the time of the assault, using a two-inch folding knife to assault the victim, and throwing the knife after using it. Sanchez, who was now more relaxed and cooperative, told Officer Rave that he would show the officers where the assault took place and where he threw the knife. When Officer Monroe returned to the interview room a few minutes later, Officer Rave informed Officer Monroe of Sanchez's additional statements and of

Sanchez's willingness to go to the crime scene with the officers. According to Officer Rave, Huffman was present when he advised Officer Monroe of the additional information that he had received from Sanchez.

At 6:39 p.m.—15 minutes after the police station activity log indicates that Huffman left the station—Officer Rave took Sanchez to the crime scene. Officer Monroe arrived in a separate vehicle. Sanchez showed the officers where the assault took place, how it happened, and where he threw the knife. He also gave the officers the names of other individuals involved in the assault. The officers and Sanchez were at the location for approximately 15 minutes. Officer Rave did not interview Sanchez while transporting him to or from the scene.

## 2. *Officer Monroe*

Officer Monroe's account of the interrogation mostly agrees with Officer Rave's account but supplements Rave's account and differs in some respects. Officer Monroe stressed that Huffman repeatedly told her son to tell the truth and that Huffman, like Officer Rave and himself, never raised her voice. While Officer Rave could not recall why Officer Monroe showed Huffman the picture of the victim, Officer Monroe testified that, at one point during the interview, Huffman was "very, very upset" and wanted to know about the assault victim's injuries. In response, Officer Monroe placed the picture in front of Huffman, and she began crying; Sanchez also appeared upset by the picture. According to Officer Monroe, he did not show the picture to Huffman and Sanchez as a tactic to get Sanchez to confess, and he only showed them the picture after Huffman asked about the victim's injuries. Officer Monroe testified that Sanchez's attitude changed from "cocky" to "serene" after Huffman told Sanchez to "tell the truth," and Sanchez then confessed.

In contrast to Officer Rave's testimony, Officer Monroe testified that he did not remember Huffman coming back into the interview room. According to Officer

Monroe, Huffman was not given an opportunity to go to the site of the assault because the officers "didn't know where [Huffman] was at the time."

### 3. *Huffman*

Huffman's account of the interrogation drastically differs from the officers' testimony. Huffman testified that the officers told her and Sanchez that Sanchez was going to jail. When Huffman asked why, the officers told her for "attempted murder and assault with a deadly weapon." Both officers deny ever threatening to charge Sanchez with attempted murder. Huffman stated that the officers denied her request to talk to her son and refused to explain why they needed to question her son.

According to Huffman, the officers' tone during the questioning was "angry and very intimidating towards [Huffman] and [her] son." Huffman described Officer Rave's attitude and behavior during questioning as follows:

> He was rather angry and he—he got up, like, you know, really close in my face, as well as my son's face, and he was like, he's going to go to jail. He needs, you know, he needs to tell us what happened. And then he, you know, went up to my son and—well, my son was sitting there and he was saying the same thing to him: You need to tell us what happened. He was rather angry.

Officer Rave's behavior surprised Huffman because she considered him a part of her family. Huffman described Officer Monroe as not "quite as angry as Officer Rave, but he was angry and he was rather intimidating." Officer Monroe "kept badgering" Sanchez, and when Huffman asked to speak to her son, the officers told her that Sanchez was in their custody and that if she wanted to talk to him, she needed to sign the waiver form. Officer Monroe repeatedly told Huffman that Sanchez was going to jail.

Huffman describes a confused scene in which she, as well as the officers, asked Sanchez what had happened. The officers asked Sanchez about his involvement in the assault, and Sanchez kept saying, "I didn't do it." According to Huffman, she started getting angry at Sanchez because she did not know what was happening. Huffman stated that, at one point in time, Officer Rave, Officer Monroe, and Huffman "were angry" and "showing anger" toward Sanchez. Huffman testified that Sanchez made a statement "when we were hollering at him." Right before Sanchez made the statement, Huffman told Sanchez to "say something" and that he "need[ed] to tell them." Huffman denied that the officers showed her a picture of the victim's injuries in response to a question that she had asked. She said that Sanchez confessed after the officers showed the picture.

After Sanchez confessed, Huffman became upset, started to cry, left the police station, and went home. She eventually returned to the police station, but the officers had not returned to the station with her son. When the officers eventually brought her son back to the station, they denied Huffman's request to talk to him. Huffman says she never knew that the officers were going to take Sanchez to the crime scene.

### B. *Magistrate Judge's Report and Recommendation*

Sanchez was charged with assault with a dangerous weapon within Indian country and assault resulting in serious bodily injury, in violation of 18 U.S.C. §§ 2, 113(a)(3) and (6), and 1153. He moved to suppress his statements to Officers Rave and Monroe, arguing that his confession was involuntary. The magistrate judge concluded that, under the totality of the circumstances, Officers Rave and Monroe overbore Sanchez's will during the interrogation, rendering Sanchez's confession involuntary.[2] *United States v. Sanchez*, No. 8:09CR99, 2009 WL 1975074, at *6 (D. Neb. June 25, 2009) ("*Sanchez I*").

---

[2]Because the magistrate judge found the confession involuntary, it determined that any statements Sanchez made after the confession should be suppressed as fruit of the poisonous tree under *Wong Sun v. United States*, 371 U.S. 471 (1963). *Id*. at *8.

-8-

First, the magistrate judge considered "Sanchez's capacity to resist pressure to confess." *Id*. He noted that Sanchez had "met the requirements for graduation from the Winnebago Public High School" and was "of average intelligence in most respects." The magistrate judge took judicial notice of the district court's prior memorandum opinion finding that Sanchez should be treated as an adult. In that opinion, the district court made "findings regarding Sanchez's age, social background, extent and nature of prior delinquency, his present intellectual development and psychological maturity, and the nature of past treatment and response to such treatment." *Id*. The magistrate judge found no evidence that Sanchez was mentally impaired but cited a psychological assessment that concluded that Sanchez "appears to be rather immature and easily influenced by others." *Id*. Although Sanchez "demonstrated a capacity to resist pressure to confess when he denied having assaulted the victim" at the outset of the interview, the magistrate judge determined that this capacity to resist did not mean that Sanchez's will was not later overborne. *Id*. Therefore, he found that "Sanchez had a below-average ability to resist pressure to confess during the interrogation." *Id*.

Second, the magistrate judge considered the officers' conduct during the interrogation. *Id*. He found Huffman's testimony "more credible than the officers on two specific issues": Huffman's testimony regarding "events following Sanchez's statements" and "the demeanor of the officers during the interview." *Id*. The magistrate judge

> discount[ed] the officers' testimony that they remained seated during the interview and never raised their voices. Given that Sanchez continually denied any involvement in the assault when the officers had witness statements implicating Sanchez, Sanchez's answers to questions were contradictory, Ms. Huffman repeatedly told Sanchez to tell the truth, and officers wanted to "get the matter resolved," it would be reasonable to assume the interview was emotionally charged and police officers would have raised their voices under such circumstances.

*Id.* at *7. He specifically found that the officers were angry and intimidating toward Sanchez, got close to Sanchez's face, yelled and badgered Sanchez, told Sanchez that he was "going to jail," and threatened Sanchez with charges of attempted murder and assault with a deadly weapon. *Id.* Additionally, the magistrate judge concluded that the officers' "threat of possible violent retaliation" by the victim's brother—who had a reputation for violence—was "particularly coercive in light of the fact Officer Rave knew Sanchez had younger sisters." *Id.* Also, he found that the officers' showing Sanchez a picture of the victim's injuries "may have been a significant factor in overbearing the will of Sanchez, given his level of immaturity, low tolerance for resisting others' influence, and seeing his mother emotionally upset after viewing the graphic photograph of [the victim's] injuries." *Id.*

Finally, the magistrate judge determined that Huffman's questioning of Sanchez about the assault at the same time as the officers did not make her an "instrument or agent" of the government because "Huffman's testimony indicates she did not act with the intent to assist law enforcement efforts, but to further her own ends as a concerned mother." *Id.* Thus, Huffman acted in a "private capacity." *Id.* The magistrate judge thus found that Huffman's conduct *did not* constitute state action, but he nonetheless concluded that "the facts of this case are sufficient to support a finding that Sanchez's will was overborne prior to his confession." *Id.* at *8.

The district court adopted the magistrate judge's report and recommendation and granted Sanchez's motion to suppress. *United States v. Sanchez*, No. 8:09CR99, 2009 WL 2516221 (D. Neb. Aug. 13, 2009) ("*Sanchez II*").

## II. *Discussion*

On appeal, the government argues that the district court erroneously suppressed Sanchez's confession after finding that the officers' conduct overbore Sanchez's will. In support of this argument, the government cites the undisputed evidence that Sanchez was advised of his *Miranda* rights, understood them, and waived them before

the officers asked him any questions. Additionally, the government notes the relatively short duration of the interrogation—26 minutes[3]—which includes the reading and waiver of Sanchez's *Miranda* rights. Also, the government points out that (1) neither Sanchez nor his mother ever asked to end the interview or invoked the right to counsel; (2) the magistrate judge found Sanchez to be of average intelligence "in most respects"—a factor repeatedly held to favor a finding of voluntariness; and (3) under this court's precedent, raised voices do not render a confession involuntary.

In response, Sanchez maintains that the district court correctly granted his motion to suppress his confession as involuntary. According to Sanchez, from two conflicting accounts of the interrogation, the district court credited Huffman's testimony as the most credible and consistent with the independent evidence; Huffman's testimony demonstrated that the officers' approach to the interrogation was angry, aggressive, and threatening and that the officers used coercive tactics, such as suggesting retaliation against Sanchez's family and showing graphic photographs of the victim. Sanchez asserts that these tactics compromised his will, as he was a 16-year-old found to be immature and unusually susceptible to influence at the time of the confession. Under these circumstances, Sanchez contends that his will was overborne.

"We review the district court's ultimate determination of voluntariness de novo, but we review the factual findings underlying that determination for clear error. The government must prove by a preponderance of the evidence that the challenged

---

[3]Officer Rave testified that Huffman and Sanchez arrived at the police station at 5:55 p.m. According to Officer Rave, three minutes after their arrival, approximately 5:58 p.m., he advised Sanchez of his *Miranda* rights. The police station activity log shows that Huffman left the station at 6:24 p.m., or approximately 29 minutes after her and Sanchez's arrival at the police station. Based on this testimony and evidence, the magistrate judge found that the interview lasted approximately 26 minutes. Neither the government nor Sanchez disputes this factual finding. *Sanchez I*, 2009 WL 1975074, at *3 ("The interview lasted 26 minutes.").

statements were voluntary." *United States v. Astello*, 241 F.3d 965, 966 (8th Cir. 2001) (internal citation omitted).

Sanchez does not dispute that the officers read him his *Miranda* rights and that he waived those rights at the beginning of the interrogation.[4] "We . . . place significant weight on the fact that [Sanchez does not contest that] he had a subjective understanding of his *Miranda* rights at the time of the interview." *United States v. LeBrun*, 363 F.3d 715, 726 (8th Cir. 2004) (en banc). "Cases in which a defendant can make a colorable argument that a self-incriminating statement was compelled despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare." *Astello*, 241 F.3d at 966 (internal quotations, alteration, and citation omitted).

"To determine whether this is one of those rare cases, we consider the totality of the circumstances surrounding [Sanchez's] confession, focusing on both the conduct of the agents and [Sanchez's] capacity to resist pressure to confess." *Id.* at 967. We "consider the totality of the circumstances, even where interrogation of juveniles is involved." *United States v. F.D.L.*, 836 F.2d 1113, 1119 (8th Cir. 1988). In conducting this test, we are mindful of the Supreme Court's directive that "'the greatest care' must be taken to assure that an alleged confession of a juvenile was voluntary." *United States v. White Bear*, 668 F.2d 409, 413 (8th Cir. 1982) (per curiam) (citing *In re Gault*, 387 U.S. 1, 55 (1967); *Gallegos v. Colorado*, 370 U.S. 49, 54 (1962); *Haley v. Ohio*, 332 U.S. 596, 599–600 (1948) (plurality opinion)).

In considering the totality of the circumstances, we review "whether the confession was extracted by threats, violence, or direct or implied promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired." *Astello*, 241 F.3d at 966 (internal quotations and citation omitted). More

---

[4]At the suppression hearing, Sanchez's counsel conceded to the magistrate judge that he "never challenged the *Miranda* warnings" and instead maintained that "it all comes down to the voluntariness of [Sanchez] making this statement."

specifically, "[w]e consider, among other things, the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." *Sheets v. Butera*, 389 F.3d 772, 779 (8th Cir. 2004).

### 1. *Police Coercion*

Obviously, interrogation of a suspect will involve some pressure because its purpose is to elicit a confession. In order to obtain the desired result, interrogators use a laundry list of tactics. Numerous cases have held that questioning tactics such as a raised voice, deception, or a sympathetic attitude on the part of the interrogator will not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne.

*Astello*, 241 F.3d at 967 (internal quotations and citations omitted). "[T]here is nothing inherently wrong with efforts to create a favorable climate for confession." *United States v. Santos-Garcia*, 313 F.3d 1073, 1079 (8th Cir. 2002) (internal quotations and citation omitted).

Here, Sanchez concedes "that the Eighth Circuit has said that raised voices do not necessarily render a confession involuntary." Nevertheless, he argues that the officers' use of other coercive methods led to his involuntary confession; these tactics include threatening to charge Sanchez with attempted murder, "plant[ing] the idea that the assault victim's brother may retaliate," and "display[ing] a graphic photo of the assault victim to Sanchez and his mother."

The relevant question is whether the officers used methods "so coercive as to deprive [Sanchez] of [his] ability to make an unconstrained decision to confess." *Astello*, 241 F.3d at 967 (internal quotations and citation omitted). The officers need not have engaged in "actual violence" for a court to conclude that coercion existed; instead, "a credible threat is sufficient" because "coercion can be mental as well as

-13-

physical." *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991) (internal quotations and citation omitted).

The district court[5] found that the "[o]fficers told Sanchez he was 'going to jail,'" and threatened him with charges of attempted murder and assault with a deadly weapon." *Sanchez I*, 2009 WL 1975074, at *7. The court based this finding on Huffman's testimony.[6] Huffman testified that she heard the officers say that Sanchez "was going to go to jail." Huffman then asked the officers why Sanchez was going to jail, and the officers replied "attempted murder and assault with a deadly weapon." Crediting Huffman's account, as did the district court, we conclude, however, that the record does not support a conclusion that the officers threatened Sanchez with charges of attempted murder and assault with a deadly weapon. The officers' response to Huffman's question was not a threat to Sanchez "but rather a truthful response" to Huffman's question; in fact, Sanchez was later actually charged with assault with a dangerous weapon within Indian country and assault resulting in serious bodily injury. *See United States v. Murdock*, 491 F.3d 694, 699 (7th Cir. 2007) ("The record shows that, when [the defendant] asked what he would be charged with, [the officer] responded that [the defendant] would be charged with possession of drugs and a gun. This was not a threat, but rather a truthful response to [the defendant's] question based on the evidence the police found during their investigation."). Furthermore, there is no evidence in the record that the officers threatened to charge Sanchez with attempted murder or other crimes *if* he refused to speak with them or confess.

---

[5]Because the district court adopted the magistrate judge's report and recommendation, *Sanchez II*, 2009 WL 2516221, at *1, we will consider the magistrate judge's findings made in *Sanchez I*, 2009 WL 1975074, as those made by the district court.

[6]On appeal, the government does not challenge the district court's decision to credit Huffman's testimony over that of the officers.

The district court also found that "the officers' suggestion of possible retaliation by the victim's brother, who was known to be dangerous, may reasonably be considered a threat to a person in Sanchez's position" and that "[s]uch a threat of possible violent retaliation may be considered particularly coercive in light of the fact Officer Rave knew Sanchez had younger sisters." *Sanchez I*, 2009 WL 1975074, at *7. The potential coercive nature of mentioning possible retaliation by the victim's brother is overstated given its grounding in facts known to the officers. Specifically, Officer Monroe testified that the victim's brother has "been known to carry shotguns and he's been known to take care of his brothers"; therefore, the officers "informed Miss Huffman and [Sanchez] that . . . [the officers] wanted to avoid any type of retaliation from [the victim's brother] to coming up hurting . . . [Huffman] or [Sanchez's] family members there at the house." Neither Huffman's testimony nor any other evidence in the record refutes the officers' claim that the victim's brother had a reputation for violence; there is no evidence that the officers were not being truthful in communicating this potential threat to Huffman and Sanchez. Additionally, there is no evidence in the record that the officers promised Sanchez that if he confessed, they would protect him from the victim's brother. *See Fulminante*, 499 U.S. at 288.

The district court additionally cited the officers' conduct in "allowing Sanchez to see a photograph of the victim's injuries" as "a significant factor in overbearing the will of Sanchez, given his level of immaturity, low tolerance for resisting others' influence, and seeing his mother emotionally upset after viewing the graphic[7] photograph of [the victim's] injuries." *Sanchez I*, 2009 WL 1975074, at *7. Huffman denied that the officers showed her the victim's picture in response to a question from her. When asked whether the officers showed her the picture because she asked them what had occurred, Huffman testified that she asked her son about the incident, not the officers. According to Huffman, Sanchez confessed after the officers showed the victim's picture. More specifically, she stated that Sanchez made a statement "when

---

[7]Officer Monroe admitted that the photograph was "pretty graphic."

-15-

we were hollering at him" and that right before he confessed, she told Sanchez to "say something" and that he "need[ed] to tell them."

As stated *supra*, "interrogation of a suspect will involve some pressure because its purpose is to elicit a confession." *Astello*, 241 F.3d at 967. "Showing a . . . suspect photographs of the . . . victim is not inherently coercive police conduct . . . ." *Noble v. State*, 892 S.W.2d 477, 483 (Ark. 1995) (citing *Derrick v. Peterson*, 924 F.2d 813 (9th Cir. 1990)), *overruled on other grounds*, *Grillot v. State*, 107 S.W.3d 136 (Ark. 2003). Here, Huffman never testified that the officers combined the picture display with threats. The display of the picture "does not resemble the extreme conduct found to be improper in [other] cases." *People v. Anderson*, Docket No. 279772, 2008 WL 5273534, at *4 (Mich. Ct. App. Dec. 18, 2008) (unpublished per curiam) ("Defendant argues that it was coercive for the police to show him a sketch and photograph of the victim. However, the mere display of these items was not accompanied by any threats and does not resemble the extreme conduct found to be improper in the cases cited by defendant.") (citing *Davis v. United States*, 32 F.2d 860, 861 (9th Cir. 1929) (the police took the defendant into a morgue room where the body of the victim was "being drained" and made him examine the wounds); *Stevenson v. Boles*, 221 F. Supp. 411 (N.D.W.V. 1963) (the police told the defendant that he had to make a statement or they were going to take him to the scene where the decedent's bloody body was still present); *State v. Cook*, 221 A.2d 212 (N.J. 1966) (the police held the low-IQ defendant's face six inches from a dead child, and then beat him with a rubber hose)). The presence and use of the victim's photograph in this particular interrogation does not rise to the level of coercive police conduct considered prohibited.

Significantly, Huffman testified that Sanchez confessed not solely because of police questioning and seeing the victim's photograph but also in response to her instruction—*not the officers' instruction*—"to say something" and that he "need[ed] to tell them." The district court noted that Huffman "posed questions and made statements to Sanchez during the officers' questioning." *Sanchez I*, 2009 WL 1975074,

-16-

at *7. Accordingly, it considered whether law enforcement used Huffman to coerce Sanchez's confession and determined that "Huffman's conduct does not constitute state action." *Id*. at *8. The court based this finding on Huffman's testimony, which indicated that "she did not act with the intent to assist law enforcement efforts, but to further her own ends as a concerned mother." *Id*. at *7.

"[T]he constraints of the . . . Fifth Amendment[ ] do not apply to purely private activity." *United States v. Garlock*, 19 F.3d 441, 442 (8th Cir. 1994). But "the government can exercise such control over a private actor that a 'private' action can fairly be attributed to the government for purposes of the . . . Fifth Amendment." *Id*. at 443. A defendant must demonstrate "that, in light of all the circumstances, [the private individual] acted as an instrument or agent of the government." *Id*. (internal quotations and citation omitted). A defendant satisfies this test "by showing that the government exercised such coercive power or such significant encouragement that it is responsible for [the private individual's] conduct, or that the exercised powers are the exclusive prerogative of the government." *Id*. (internal quotations and citation omitted).

Sanchez has not challenged the district court's finding that Huffman did not act as an instrument or agent of the government. Because Huffman acted as a private citizen and not an agent of law enforcement, the effect of her questions on Sanchez is not attributable to police interrogation. *See United States v. Erving L.*, 147 F.3d 1240, 1251 (10th Cir. 1998) ("To the extent that E.L.'s will was overborne, it was overborne by the actions of his parents rather than the actions of the officers. This type of non-government pressure does not render a confession involuntary."). The relevant question is whether the officers' actions were so "coercive as to deprive [Sanchez] of [his] ability to make an unconstrained decision to confess." *Astello*, 241 F.3d at 967 (internal quotations and citation omitted). Huffman's own testimony demonstrates that, despite the officers' behavior, Sanchez repeatedly maintained that he "didn't do

-17-

it." Furthermore, she admitted that just before Sanchez confessed, Huffman—not the officers—told him to "say something" and that he "need[ed] to tell them."

## 2. *Length of the Interrogation*

Neither party disputes the relatively brief duration of the interrogation—26 minutes—which includes the reading and waiver of Sanchez's *Miranda* rights. This factor weighs in favor of a finding that Sanchez's confession was voluntary, as we have previously "place[d] substantial weight on the fact that [the defendant] confessed after *a mere thirty-three minutes*." *LeBrun*, 363 F.3d at 726 (emphasis added). As in *LeBrun*, "this is not a situation where the officers wore down a defendant's will with persistent questioning over a considerable length of time." *Id.*; *see also United States v. Dehghani*, 550 F.3d 716, 721 (8th Cir. 2008) ("[T]he interrogation lasted approximately five and a half hours, which is not sufficient to render the confession involuntary per se."); *Simmons v. Bowersox*, 235 F.3d 1124, 1133 (8th Cir. 2001) ("We do not find the period of interrogation in the present case—approximately two hours—to be particularly lengthy."); *Jenner v. Smith*, 982 F.2d 329, 334 (8th Cir. 1993) ("The fact that the questioning extended for six or seven hours is not per se unconstitutionally coercive.").

## 3. *Location of the Interrogation*

The setting of an interrogation may not be "police dominated, even though the interview took place at a police station." *United States. Galceran*, 301 F.3d 927, 930 (8th Cir. 2002). Nevertheless, we find that the location of the interrogation weighs in favor of finding Sanchez's confession involuntary, given the district court's finding that the officer squad room where the interrogation took place "is approximately 15 by 25 feet long, and contains computers for officers to type their reports" and that "[t]he parties were seated such that, no table, desk, or other furniture separated Sanchez from the officers." *Sanchez I*, 2009 WL 1975074, at *2. The location of the interrogation is in direct contrast to *United States v. Brave Heart*, in which we noted

-18-

that the defendant's questioning at the police station "occurred in a relatively large room, each officer sat several feet from [the defendant], and neither officer used a menacing tone or made any threats." 397 F.3d 1035, 1040 (8th Cir. 2005).

4. *Sanchez's Maturity, Education, Physical Condition, and Mental Condition*

With regard to Sanchez's maturity, education, physical condition, and mental condition, the district court found that, "[i]n terms of education, Sanchez has met the requirements for graduation from the Winnebago Public High School, and is of average intelligence in most respects." *Sanchez I*, 2009 WL 1975074, at *6. As to Sanchez's mental condition, the district court determined that "there exists no evidence to suggest Sanchez is not mentally well." *Id*. Nevertheless, after reviewing the district court's prior memorandum opinion finding that Sanchez should be treated as an adult, the district court found that "the record in this case indicates Sanchez appears to be rather immature and easily influenced by others." *Id*. Although recognizing that Sanchez "demonstrated a capacity to resist pressure to confess when he denied having assaulted the victim" at the beginning of the interview, the district court determined that "it does not necessarily follow that his will cannot become overborne later in the same interrogation." *Id*. (citing *Haley v. Ohio*, 332 U.S. 596, 599–600 (1948) (indicating 15 year old's will overborne after five hours of interrogation); *Taylor v. Maddox*, 366 F.3d 992, 1015–16 (9th Cir. 2004) (stating 16- year-old boy's will overborne after three hours of interrogation)). Accordingly, it found that "Sanchez had a below-average ability to resist pressure to confess during the interrogation." *Id*. (citing *United States v. Morris*, 491 F. Supp. 226, 229 (S.D. Ga. 1980) (confession inadmissible where 22-year-old defendant was immature, yet not unintelligent)).

In conducting our totality-of-the-circumstances review, we must not only consider Sanchez's maturity level *but also* his education, physical condition, and mental condition. *See Sheets*, 389 F.3d at 779. With regard to these latter three factors, the district court specifically found that Sanchez was of "average intelligence" and that no evidence exists "to suggest Sanchez is not mentally well," nor can we find any

-19-

evidence that Sanchez is in poor physical condition. "Generally, we have concluded that where the defendant possessed at least average intelligence, then his inculpatory statements were not compelled." *LeBrun*, 363 F.3d at 726 (citing *United States v. Gallardo-Marquez*, 253 F.3d 1121, 1123–24 (8th Cir. 2001) (concluding confession was voluntary where defendant was of average intelligence and had prior contact with law enforcement); *Astello*, 241 F.3d at 968 (concluding that confession of an 18-year-old was voluntary where he had completed 11th grade and possessed a capacity to understand what was being said during the interview); *Simmons*, 235 F.3d 1134 (concluding that confession was voluntary where defendant had full scale I.Q. of 88); *Wilson v. Lawrence County*, 260 F.3d 946, 949 n. 4, 952–53 (8th Cir. 2001) (finding involuntary confession where defendant was mentally retarded, his overall mental abilities were in the bottom two percent of the population, and testimony revealed that he could be "talked into anything")).

Thus, the district court placed substantial weight upon Sanchez's immaturity in concluding that he could not resist police pressure to confess. But the cases that the district court cites in support of its finding belie this conclusion. This is not a case in which the interrogation lasted several hours, as in *Haley* and *Taylor*; instead, it lasted 26 minutes. The shortness of the interrogation, combined with the district court's finding that Sanchez demonstrated his ability to resist pressure to confess at the beginning of the interview, undermine the conclusion that his immaturity led to his confession. Moreover, we note that the district court's prior memorandum order found that Sanchez was able to stand trial as an adult.

### 5. *Totality-of-the-Circumstances Determination*
In conclusion, we hold that Sanchez's will was not overborne by improper police conduct warranting suppression of his incriminating statements. In considering the totality of the circumstances surrounding Sanchez's confession, we find that while the location of the interrogation weighs in favor of finding Sanchez's confession involuntary, the remaining factors—the degree of police coercion, the length of the

interrogation, and the defendant's maturity, education, physical condition, and mental condition—weigh in favor of a finding that Sanchez's confession was voluntary.

### III. *Conclusion*

Accordingly, we reverse the district court's grant of Sanchez's motion to suppress and remand to the district court for further proceedings consistent with this opinion.

_____